**EOD** 1-31-00

FILED-CLERK
U.S. DISTRICT COURT

00 JAN 28 PM 5:27

TX EASTERN-BEAUMONT

BY



# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

### BEAUMONT DIVISION

| | | |
|---|---|---|
| ETHAN SHAW, and<br>CLIVE D. MOON,<br>　　　On Behalf of Themselves and All<br>　　　Others Similarly Situated,<br>　　　Plaintiffs, | § § § § § § | |
| v. | § § | 1:99-CV-0120 (TH) |
| TOSHIBA AMERICA INFORMATION<br>　　　SYSTEMS, Inc.,<br>NEC ELECTRONICS, Inc.,<br>TOSHIBA CORPORATION,<br>TOSHIBA AMERICA, Inc.,<br>TOSHIBA AMERICA ELECTRONIC<br>　　　COMPONENTS, Inc., and<br>NEC CORPORATION,<br>　　　Defendants. | § § § § § § § § § § | JURY |

## MEMORANDUM AND OPINION ORDER

On October 28, 1999 Plaintiff Class Representatives Ethan Shaw and Clive D. Moon

informed this Court they had settled their claims against Toshiba America Information Systems,

Inc., Toshiba Corporation, Toshiba America, Inc., and Toshiba America Electronic Components,

329

Inc.  Accordingly, this Court conditionally certified the settlement class, preliminarily approved

the parties' October 25, 1999 Settlement Agreement (the "Settlement Agreement"), and enjoined

the pursuit of litigation in other forums addressing the rights and claims before it.  In that same

order this Court set a hearing on whether to finally approve the parties' October 25, 1999

Settlement Agreement on January 19, 2000 (the "Fairness Hearing").  Now, after the Fairness

Hearing, the parties jointly move this Court to approve the approximately $2.1 billion

($2,100,000,000.00) Settlement Agreement along with attorneys' fees in the amount of $147.5

million ($147,500,000.00).  It will.

## 1. Facts[1] and Procedural History

On March 5, 1999 Ethan Shaw and Clive D. Moon (collectively referred to as

"Plaintiffs") filed a class-action complaint on behalf of themselves and all others similarly

situated against Toshiba America Information Systems, Inc. ("Toshiba") and NEC Electronics,

Inc.[2]  Plaintiffs alleged Toshiba and NEC designed, manufactured, created, distributed, sold,

transmitted, and marketed faulty, floppy-diskette controllers ("FDC's") containing allegedly

defective microcode.[3]  On July 15, 1999 Toshiba and NEC filed their summary-judgment

---

[1]This Court's "Findings of Fact" are listed at the end of this memorandum and opinion
order.  They're adopted in their entirety.

[2]Although Plaintiffs initially sued Toshiba America Information Systems, Inc. and NEC
Electronics, Inc., they later added as defendants Toshiba Corporation, Toshiba America, Inc.,
Toshiba America Electronic Components, Inc., and NEC Corporation.  For simplicity, this Court
will collectively refer to all of the Toshiba entities as "Toshiba"; and it will collectively refer to
both NEC entities as "NEC."

[3]For a more complete explanation of the Plaintiffs' allegations, see this Court's August
29, 1999 *Order Denying Motions for Partial Summary Judgment* [99] pp.2-3.  Previously, this
Court referred to the alleged FDC defect or condition as a "boundary-error problem."  For the
purposes of this opinion, this Court will use "alleged FDC defect," "alleged FDC condition," and

motions arguing, *inter alia*, the Plaintiffs' claims could not be brought under Title 18 U.S.C.

§ 1030, the "Computer Fraud and Abuse Act." On August 20, 1999 this Court referred this case

to the Honorable Thomas A. Thomas for mediation. Then, on August 24, 1999, this Court

ordered the parties to resume mediation. Meanwhile, after extensive briefing by the parties, this

Court denied Toshiba's and NEC's summary-judgment motions on August 26, 1999. *See Order*

*Denying Motion for Partial Summary Judgment* [98]; *Order Denying Motions for Partial*

*Summary Judgment* [99]. Apparently, the Plaintiffs and Toshiba continued their settlement

discussions and, eventually, reached an agreement. On October 28, 1999 the Plaintiffs and

Toshiba informed this Court they had settled this lawsuit. *See Joint Motion for Preliminary*

*Approval of Settlement Agreement, Temporary Class Certification, and Order Protecting*

*Jurisdiction of Court* [144]. Accordingly, this Court conditionally certified the settlement class,

preliminarily approved the parties' Settlement Agreement, and enjoined the pursuit of litigation

in other forums addressing the rights and claims before it. *See Order Conditionally Certifying*

*Class, Preliminarily Approving Settlement and Settlement Agreement and Protecting This*

*Court's Jurisdiction* [151].

Under the terms of the Settlement Agreement Toshiba agrees to pay approximately $2.1

billion ($2,100,000,000.00) in the form of cash remedies, warranty remedies, hardware

replacements, software patches, and coupons all designed to repair the allegedly defective FDC's

in Toshiba's computers and compensate their respective owners. In return, Toshiba admits no

liability and avoids the further expense and inconvenience of complex litigation. In short, class

---

"alleged FDC boundary-error problem" interchangeably. Nonetheless, the reader should keep in
mind the alleged defect stems from the allegedly defective *microcode* contained within the
FDC's. *See id.*

members get their computers overhauled; and Toshiba gets closure.

However, this Court must make several determinations before any of this can happen.

First, this Court must find the proposed class satisfies the requirements of Federal Rule of Civil

Procedure 23. It does. Second, this Court must find the approximately $2.1 billion

($2,100,000,000.00) settlement is "fair, adequate, and reasonable." It is. Finally, this Court must

find the $147.5 million ($147,500,000.00) in attorneys' fees is "fair, just, and reasonable." It is.

### 2. A Brief History of the Class Action

Federal Rule of Civil Procedure 23 says, in part:

> *(a) Prerequisites to a Class Action.* One or more members of a class may sue or
> be sued as representative parties on behalf of all only if (1) the class is so
> numerous that joinder of all members is impracticable, (2) there are questions of
> law or fact common to the class, (3) the claims or defenses of the representative
> parties are typical of the claims or defenses of the class, and (4) the representative
> parties will fairly and adequately protect the interests of the class...
> *(b) Class Actions Maintainable.* An action may be maintained as a class action if
> the prerequisites of subdivision (a) are satisfied, and in addition:
>> ...(3) the court finds that the questions of law or fact common to the
>> members of the class predominate over any questions affecting only individual
>> members, and that a class action is superior to other methods for the fair and
>> efficient adjudication of the controversy.

FED.R.CIV.P. 23. This is the federal rule relating to class actions–specifically, the "23(b)(3) class

action."[4] But where did class actions–these representative lawsuits–come from? So glad you

---

[4]There are two other types of class actions under this particular rule. There's the
"23(b)(1) class action" if "the prosecution of separate actions by or against individual members
of the class would create a risk of (A) inconsistent or varying adjudications with respect to
individual members of the class...or (B) adjudications with respect to individual members of the
class which would as a practical matter be dispositive of the interests of the other members not
parties to the adjudications or substantially impair or impede their ability to protect their
interests." FED.R.CIV.P. 23(b)(1). Then there's the "23(b)(2) class action" if "the party opposing
the class had or refused to act on grounds generally applicable to the class, thereby making
appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a
whole." FED.R.CIV.P. 23(b)(2). As will be shown, Plaintiffs' injunctive claims, coupled with the

asked . . .

### A. The Origin of the Class Action–Representative Litigation in Medieval England

Although it appears that the modern-day class action was born probably some time during the Middle Ages, there are reports of ecclesiastical proceedings against numerous insects and animals dating as early as A.D. 824. *See* Nicholas Sellers, *Criminal Prosecution of Animals* (in two parts), 35 THE SHINGLE 179 (Nov. 1972), 36 THE SHINGLE 19 (Jan. 1973), p.18. Apparently, there were two kinds of insect and animal trials in early courts–those brought against individual offenders which had killed humans or committed other crimes, and those brought in the church courts against insects, rodents, or other vermin (in effect, defendant class actions) to cause such creatures to stop their depredations against certain villages or communities. *See id.* Here's how the latter-type "defendant class actions" would go:

> Inhabitants of an area afflicted with locusts, rats, weevils, or other depredators would petition the Church for relief. The offending insects or rodents would be summoned to court, and, upon their inevitable nonappearance, tried in abstentia, and ordered to cease and desist from their wrongful behavior and to depart the area, or to suffer excommunication and church anathemas.

*Id.* These early "defendant class actions" "date from a very early period: in A.D. 824, against moles in Aosta; in A.D. 864, bees in Worms;[5] in A.D. 886 locusts of Romagna; and in the same century, serpents of Aux-les-Bains."[6] *Id.*

---

satisfaction of the Rule 23(a) requirements, would be sufficient to certify a class under Federal Rule of Civil Procedure 23(b)(2), too.

[5]That's bees in "Worms," the city–not bees in "worms," the creatures.

[6]Indeed, one sixteenth-century attorney, Bartholemy de Chassenee (or Chasseneux), made his reputation by showing his legal skill as court-appointed counsel for the rats of Autun. *See* Nicholas Sellers, *Criminal Prosecution of Animals* (in two parts), 35 THE SHINGLE 179 (Nov. 1972), 36 THE SHINGLE 19 (Jan. 1973), pp.18-19. The Court summoned the rats which, of

The modern-day class action is a representative lawsuit born probably some time during the Middle Ages. In medieval England social relations defined life according to group status. In re Joint Eastern and Southern Dist. Asbestos Litig.,[7] 129 Bankr. 710, 803 (E. & S.D.N.Y. 1991), judgment vacated by, In re Joint Eastern and Southern Dist. Asbestos Litig., 982 F.2d 721 (2nd Cir.(N.Y.) 1992), opinion modified on rehearing by, In re Joint Eastern and Southern Dist. Asbestos Litigat., 993 F.2d 7 (2nd Cir. 1993) ("In re Asbestos Litig."). People belonged to defining groups like villages, guilds, parishes, and manors; and a person's status as a group member gave rise to known duties common to all group members. See id. Legal and religious authorities collectively enforced members' duties. See id. When litigation became necessary to settle disputes, chosen representatives spoke for their particular groups in manorial, royal, and ecclesiastical courts. See id. "The villeins[8] of the manor, whose rights and duties ran to the manor lord, the frankpledge[9] group, whose obligations ran to the King, and the parish, whose

---

course, failed to appear. *See id.* Chassenee won a continuance on the ground that his clients—the rats—were scattered throughout the villages and, consequently, did not timely receive the court's notice. *Id.* When it came time for the second trial setting, Chassenee's clients—the rats—failed to appear yet again. *Id.* This time, Chassenee argued that the roads were in poor condition and hungry cats waited in ambush for his clients should they dare to approach the courthouse. *Id.* The court granted yet another continuance for Chassenee's rats. *Id.* Unfortunately, this was the last continuance Chassenee won for his clients. *Id.*

[7]This case provides an incredibly thorough history of the class action lawsuit.

[8]Villeins? A villein is (or, to be more precise, was) "1) a free common villager or village peasant of any of the feudal classes lower in rank than the thane; 2) a free peasant of a feudal class lower than a sokeman and higher than a cotter; 3) an unfree peasant standing as the slave of a feudal lord but free in legal relations with respect to all others." WEBSTER'S COLLEGIATE DICTIONARY 1318 (10th ed. 1993).

[9]What's a "frankpledge?" That's "an Anglo-Saxon system under which each adult male member of a tithing was responsible for the good conduct of the others; *also*: the member himself or the tithing." WEBSTER'S COLLEGIATE DICTIONARY 463 (10th ed. 1993). And a "tithing?"

benefits and duties ran from the parson and the church to the members of the local ecclesiastical unit, regularly appeared as parties in representative actions." Harold M. Downs, *Federal Class Actions: Due Process by Adequacy of Representation (Identity of Claims) and the Impact of General Telephone v. Falcon*, 54 OHIO ST. L.J. 607, 613 (1993). Thus, the collective social, political, and religious organization of medieval England necessarily spawned representative litigation.

Initially, there were two types of courts in medieval England–common-law courts and courts of chancery. "Under the unitary concept of the civil action, litigation was conceived as strictly a two party affair–one plaintiff against one defendant. The English common law courts deviated from this principle only when the coparties had closely related interests as, for example, when they were joint obligors or obligees." 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1751 (1986) (citing ZECHARIA CHAFEE, JR., SOME PROBLEMS OF EQUITY 200-01 (1950)). "While common law courts held that it was necessary to join as parties only those persons whose direct and immediate legal rights would be affected by judgment, the courts of equity sought to avoid a multiplicity of proceedings. Thus, the equity courts imposed a compulsory joinder rule that all parties materially interested–either legally or beneficially–in the subject of the suit had to be made parties so there might be a complete decree to bind all." 3 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 1.09 (3d ed. 1992), (citing 1 REPORT ON CLASS ACTIONS, ONTARIO LAW REFORM COMMISSION 5 (1982)).

---

That's "a small administrative division preserved in parts of England apparently originally made up of ten men with their families." Id. at 1238.

"From 1500 to 1850, medieval rural and town groups diminished in importance. Rapid economic development, market capitalization, centralization of political power in the King and Parliament, and a premium placed on individual liberty led to a fundamental shift in litigation responsibilities. The norm in litigation became individual litigant control. Group litigation was an exception available only in courts of equity." Harold M. Downs, *Federal Class Actions: Due Process by Adequacy of Representation (Identity of Claims) and the Impact of General Telephone v. Falcon*, 54 OHIO ST. L.J. 607, 614 (1993). "Though manor and parish group litigation theoretically continued into the eighteenth century, by the latter part of the seventeenth century these suits were heard exclusively in the equity Courts of Chancery." In re Asbestos Litig., 129 Bankr. 710, 803 (E. & S.D.N.Y. 1991). "In order to facilitate the adjudication of disputes involving common questions and multiple parties in a single action, the English Court of Chancery developed the bill of peace." 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1751 (1986).

> In a Bill of Peace, one person, called the adversary, might bring suit in equity against several persons, called the multitude, with separate but similar interests, or the multitude might sue to resolve in one action common questions of law or fact in dispute between the adversary and each member of the multitude. A common instance of this procedure was an action by the lord of a manor to resolve questions of right between himself and his various tenants. In many such suits, a few tenants would serve as representatives of the interests of the multitude.

3 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 1.09, n.83 (3d ed. 1992) (citing How v. Tenants of Brooms Grove, 1 Vern. 22, 23 Eng. Rep. 277 (1681); see Cockburn v. Thompson, 16 Ves. Jun. 321, 33 Eng. Rep. 1005 (1809); A. CHAFEE, JR., SOME PROBLEMS OF EQUITY 200 (1950); Chayes, *Foreword: Public Law Litigation and Burger Court*, 96 HARV. L. REV. 4, 26 n.130 (1982); Stephen C. Yeazell, *Group Litigation and Social Context:*

*Toward a History of the Class Action*, 77 COLUM. L. REV. 866 (1977); STEPHEN C. YEAZELL,

FROM MEDIEVAL GROUP LITIGATION TO THE MODERN CLASS ACTION (1987)). The Bill of Peace

"enabled an equity court to hear an action by or against representatives of a group if plaintiff

could establish that the number of people involved was so large as to make joinder impossible or

impracticable, that all the members of the group possessed a joint interest in the question to be

adjudicated, and that the named parties adequately represented those absent from the action." 7A

CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND

PROCEDURE § 1751 (1986) (citing Adair v. New River Co., Ct. Ch.1805, 11 Ves. Jr. 429, 443-45,

32 Eng. Rep. 1153, 1158-59). The number of representatives necessary to represent a group's

common interests varied, but enough persons had to be before the equity court so that the rights,

liabilities, and obligations of all could be litigated fairly and honestly. Id. If the equity court

permitted the suit to proceed on a representative basis–that is, as a Bill of Peace–the resulting

judgment would bind all members of the group whether they were present in the action or not.

See id. Initially, English Bills of Peace (soon to be class actions) were available only in the

equity Courts of Chancery for an accounting, declaration, or injunction–they were not available

in courts of law for damages. See 3 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS

ACTIONS § 1.09 (3d ed. 1992). However, in 1873 the English courts merged law and equity and,

consequently, permitted class actions for damages. See id. Regardless whether it was in law or

equity, "[i]t was the English bill of peace that developed into what is now known as the class

action." See id.

  *B.  The United States Models Its Class Action After the English Bill of Peace*

  The United States' class action grew out of the English Bill of Peace. As already noted,

9

"the [English] equity courts imposed a compulsory joinder rule that all parties materially interested—either legally or beneficially—in the subject of the suit had to be made parties so there might be a complete decree to bind all." 3 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 1.09 (3d ed. 1992), (citing 1 REPORT ON CLASS ACTIONS, ONTARIO LAW REFORM COMMISSION 5 (1982)). However, the English Court of Chancery adopted the Bill of Peace as an exception to this rigid compulsory joinder rule. See id. "Like England, class actions in the United States were an outgrowth of the compulsory joinder rule that prevailed in courts of equity." Id.

Justice Story, in his treatise on equity, usually receives credit for formulating the standards for class actions in the United States.[10] 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1751 (1986). Story categorized class-action suits developed from English precedent[11] into three types:

---

[10]Justice Story: "It is a general rule in equity, that all persons materially interested, either as plaintiffs or defendants in the subject matter of the bill ought to be made parties to the suit, however numerous they may be. The reason is that the court may be enabled to make a complete decree between the parties, may prevent future litigation by taking away the necessity of a multiplicity of suits, and may make it perfectly certain, that no injustice shall be done, either to the parties before the court, or to others, who are interested by a decree, that may be grounded upon a partial view only of the real merits." West v. Randall, C.C.D.R.I. 1820, 29 Fed. Cas. No. 17,424, 718, 721, 2 Mason 181, 183.

[11]Indeed, Justice Story merely built upon Lord Eldon's precedent. Lord Eldon:

> There is one class of cases, very important upon this subject: viz.
> where a person, having a Law a general right to demand service
> from the individuals of large district, to his mill, for instance, may
> sue this in Equity. His demand is upon every individual, not to
> grind corn for their own subsistence except at his mill. To bring
> actions against every individual for subtracting that service is
> regarded as perfectly impracticable. Therefore a bill is filed to
> establish that right; and it is not necessary to bring all the

(1)     Where the question is one of common or general interest and one or more
        sue or defend for the benefit of the whole;
(2)     Where the parties form a voluntary association for public or private
        purposes, and those who sue or defend may fairly be presumed to
        represent the rights and interest of the whole;
(3)     Where the parties are very numerous, and, though they have or may have
        separate and distinct interests, it is impracticable to bring them all before
        the court.  This category also requires a common or general interest.

Harold M. Downs, *Federal Class Actions: Due Process by Adequacy of Representation (Identity*

*of Claims) and the Impact of General Telephone v. Falcon*, 54 OHIO ST. L.J. 607, 620 (1993)

(citing Good v. Blewitt, 34 Engl.Rep. 542 (Ch.1815); Good v. Blewitt, 33 Eng.Rep. 343

(Ch.1807); Leigh v. Thomas, 28 Eng.Rep. 201 (Ch.1751); JOSEPH STORY, COMMENTARY ON

EQUITY PLEADINGS § 98 (1838)).  The United States Supreme Court adopted Justice Story's

analysis in Smith v. Swormstedt when it allowed all the preachers in the Methodist Episcopal

Church South to bring a representative suit seeking a declaration of the rights of each sectional

group of the Methodist Episcopal Church of the United States to funds originally belonging to

the entire church.  See 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE,

FEDERAL PRACTICE AND PROCEDURE § 1751 (1986) (citing 1853, 16 How. (57 U.S.) 288, 14

L.Ed. 942).

"The English equity rule permitting exceptions to compulsory joinder was adopted in

United States jurisprudence and was codified in the Federal Equity Rule 48 (1842), the New

---

individuals: why?  Not, that it is inexpedient, but, that it is
impracticable, to bring them all.  The Court therefore has required
so many, that it can be justly said, they will fairly and honestly try
the legal right between themselves, all other persons interested, and
the Plaintiff.

Sorry, translation unavailable.  See Cockburn v. Thompson, Ct.Ch.1809, 16 Ves.Jr. 321, 33
Eng.Rep. 1005; Adair v. New River Co., Ct. Ch.1805, 11 Ves. Jr. 429, 444, 32 Eng. Rep. 1153.

York Field Code of 1848, as amended in 1849, and Federal Equity Rule 38 (1912, the successor

to earlier Equity Rule 48 (1842))." Id. (citing <u>Gottlieb v. Wiles</u>, 11 F.3d 1004, 1004-09 (10th

Cir.1993)). The United States Supreme "Court officially abandoned old Equity Rule 48 in 1912

and adopted Equity Rule 38." Harold M. Downs, *Federal Class Actions: Due Process by*

*Adequacy of Representation (Identity of Claims) and the Impact of General Telephone v. Falcon*,

54 OHIO ST. L.J. 607, 622 (1993) (citing JAMES L. HOPKINS, THE NEW FEDERAL EQUITY RULES

145 (8th ed. 1933)). Federal Equity Rule 38:

> allowed representative suits where the parties were too numerous for joinder. In
> contrast with the prior rule [Federal Equity Rule 48], absent parties could be
> bound by subsequent judgments pursuant to this provision. One of the best
> examples of a limited fund case from this time period is <u>Hartford Life Ins. v. Ibs</u>,
> 237 U.S. 662, 35 S.Ct. 692, 59 L.Ed. 1165 (1915). The case involved an insurer's
> contingency fund created through contributions from policyholders. The Supreme
> Court found that the policy was properly treated as a unit and that the adjudication
> of rights to it had to be determined in a single suit in which all the policyholders
> were joined.

<u>In re Asbestos Litig.</u>, 129 Bankr. 710, 803 (E. & S.D.N.Y. 1991).

In 1938 Congress promulgated the first Federal Rules of Civil Procedure (along with

original Rule 23) merging law and equity (some sixty-five years *after* England) thereby making

available class-action suits for damages in the United States. <u>See</u> 3 HERBERT B. NEWBERG &

ALBA CONTE, NEWBERG ON CLASS ACTIONS § 1.09 (3d ed. 1992). The "[o]riginal Rule 23

represented a substantial restatement of former Equity Rules 38 (representative of class) and 27

(stockholders' bill), as they had been construed." Id. Under original Rule 23(a), a representative

suit was permitted where the right to enforcement for or against the class was:

1. Joint, or common, or secondary in the sense that the owner of a primary
   right refuses to enforce that right and a member of the class thereby
   becomes entitled to enforce it;

2.      Several, and the object of the action is the adjudication of claims which do
        or may affect specific property involved in the action;

3.      Several, and there is a common question of law or fact affecting the
        several rights and a common relief is sought.

FED.R.CIV.P. 23(a), 308 U.S. 689 (1939). One of the drafters of original Rule 23, Professor

Moore, characterized these three class categories as "true, hybrid, and spurious, respectively." 3

HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 1.09 (3d ed. 1992)

(citing Starrs, *The Consumer Class Action–Part II: Considerations of Procedure*, 49 B.U.L. REV.

407, 463 (1969)). The courts had difficulty implementing original Rule 23. See id. For

example, courts typically viewed "spurious" class actions as merely a form of permissive joinder.

See id.; Harold M. Downs, *Federal Class Actions: Due Process by Adequacy of Representation*

*(Identity of Claims) and the Impact of General Telephone v. Falcon*, 54 OHIO ST. L.J. 607, 632

(1993).

> Unlike the true and hybrid class actions, it was well established that a judgment in
> a spurious class action did not bind class members who were not named parties or
> who did not formally intervene in the action. Therefore, due process for unnamed
> spurious class members was usually not an issue. As a consequence of this
> nonbinding aspect of spurious class suits, the authorities were in conflict as to
> whether unnamed members of a class could benefit from the class judgment
> through post judgment intervention; but these authorities reaffirmed that such
> unnamed members did not bear the burden of an unfavorable adjudication.

Id. at 634 (citations omitted); see also 3 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON

CLASS ACTIONS § 1.09 (3d ed. 1992); 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, &

MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1751 (1986). For this and various

other reasons, criticism of original Rule 23 abounded. Eventually, in 1966, Congress completely

re-wrote Rule 23 to give us the rule we have today. See 3 HERBERT B. NEWBERG & ALBA

CONTE, NEWBERG ON CLASS ACTIONS § 1.09 (3d ed. 1992) (citing Homburger, *State Class*

*Actions and the Federal Rule*, 71 COLUM. L. REV. 609, 613 (1971)).

"It is now apparent that the increasing complexity and urbanization of modern American society has tremendously magnified the importance of the class action as a procedural device for resolving disputes affecting numerous people." Id. (citing Gallano v. Running, 353 A.2d 158, 161 (1976), 139 N.J. Super. 239). What began as a lame attempt to enjoin insects and animals from behaving like insects and animals evolved for over one hundred years into a complex machinery capable of rectifying huge wrongs spread amongst millions of people who, standing alone, would lack both the incentive and the ability to act with such curative effect. Nevertheless, complex machinery requires expert operators working in a closely monitored environment–lest the machinery never function at peak. Vague metaphors aside, class actions are complex mechanisms that require exceptional lawyers and considerable judicial oversight.

## 2. Class Certification

Again, Federal Rule of Civil Procedure 23 guides this Court in determining whether to certify this class. Today's Rule 23 says, in relevant part:

> *(a) Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class...
> *(b) Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
> ... (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other methods for the fair and efficient adjudication of the controversy.

FED.R.CIV.P. 23. "A district court must first find that a class satisfies the requirements of Rule

23, regardless whether it is certifying the class for trial or for settlement." In re Lease Oil

Antitrust Litigation, 186 F.R.D. 403, 418 (S.D. Tex.1999). This follows from Amchem

Products, Inc. v. Windsor, 521 U.S. 591 (1997), in which the United States Supreme Court held

that, except for manageability, the requirements for certifying trial classes and settlement classes

are the same. The Fifth Circuit recently addressed the standards that govern Rule 23(b)(3) class

actions in Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620 (5th Cir.1999). Before doing so,

the court "note[d] that the district court maintains great discretion in certifying and managing a

class action," and that "a district court's decision to certify a class [will be reversed] only upon a

showing that the court abused its discretion . . . or . . . applied incorrect legal standards." Id. at

624 (citing Jenkins v. Raymark Industries, 782 F.2d 468, 471-72 (5th Cir.1986); Forbush v. J.C.

Penney Co., 994 F.2d 1101, 1104-05 (5th Cir.1993)).

   Class actions are superior to multiple, individual actions when the individual actions are

economically infeasible to litigate because of the small size of the individual claims, or when the

common issues would be extremely expensive to litigate because they would require extensive

discovery. Class treatment of consumer claims is proper when the harm alleged is common to all

purchasers of a product that is claimed to be defective. The class-action procedure is appropriate

for the pursuit of consumer protection claims since it allows consumers to aggregate small claims

and bring them on behalf of the class when the amount at stake for an individual consumer would

not warrant filing suit and when they might not be able to do so on an individual basis. That is, it

permits consumers to pursue their claims in the aggregate–consumers who, standing alone,

would lack both the incentive and the ability to act with such curative effect.

   For determining whether this case is proper for class certification, Class Counsel sought

15

opinions from five leading experts on class-action issues: Professors John C. Coffee, Jr.
(Columbia University), Samuel Issacharoff (currently at Columbia University and formerly at
The University of Texas), Arthur Miller (Harvard University), Geoffrey Miller (New York
University), and Jack Ratliff (The University of Texas).[12]  Two of these experts–Professors
Coffee and Issacharoff–participated in <u>Amchem</u> in support of the group that attacked the class
action and prevailed.  Another, Professor Ratliff, has frequently testified for defendants who
oppose class certification.  Finally, Professor James J. White (University of Michigan)
determined whether the substantive law that supports the absent plaintiffs' claims is uniform
across the nation even though, under <u>Amchem</u>, manageability for trial need not be shown when a
class action settles.  The experts are unanimous: this is a proper case in which to certify an opt-
out class under Federal Rule of Civil Procedure 23.

A.    *Class Definition*

At the heart of every 23(b)(3) opt-out class action is a class definition that identifies the
persons who will be entitled to relief in the event of a judgment for the class representative, who
will be bound by the final judgment unless they opt out, and who are entitled to notice.  To serve
these functions well, a class definition should be "precise, objective, and presently ascertainable."

---

[12]Indeed, at the Fairness Hearing the following experts testified in the following order in
support of the proposed Settlement Agreement: Professor John C. Coffee, Jr., Professor Larry
Leibrock, Professor Geoffrey P. Miller, Professor Samuel Issacharoff, and Professor Arthur
Miller.  In response to an initial question concerning the certification of this proposed class,
Professor Arthur Miller had this to say about the order of testimony: "The case clearly meets the
four pre-requisites in Federal Rule 23(a) . . . There is clear predominance and clear superiority.  I
cannot add anything, really, to what Coffee and Issacharoff have said.  Professor Issacharoff said
he felt he was following Elvis.  I feel like I'm following Elvis, a children's dance, and a dog act."
(Tr. 226).  Well Professor Miller, after attending the Fairness Hearing and listening to the
testimony of five nationally renown professors of law and economics, this Court feels the writing
of this opinion necessarily falls somewhere below a poorly choreographed sock-puppet play.

MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.14 (1995).

The Settlement Agreement between the Plaintiffs and Toshiba asks this Court to certify a

class defined as follows:

> The "Settlement Class" is defined and composed of all Persons, other than the
> Settling Defendants, who are United States citizens or residents and who Own
> (which, as provided in §1, includes own or lease) a Toshiba Laptop Computer of
> any model. However, the Settlement Class shall not include Owners of Toshiba
> Laptop Computers purchased after November 8, 1999, that incorporate a floppy
> disk controller with the Hardware Fix . . . . With respect to leased Toshiba Laptop
> Computers, the Settlement Class Member who is entitled to the remedies and
> benefits afforded by this Settlement Agreement shall be determined by the lease
> agreement between the lessor and lessee, to be established by a certification of
> ownership on the Claim Form; in the event of a dispute between the lessor and
> lessee, the dispute will be decided by the Claims Administrator and Court as
> provided in §§13 and 25.

*Settlement Agreement and Release*, § 2.

This definition serves all of the purposes identified in the MANUAL FOR COMPLEX LITIGATION

(THIRD). All natural and legal persons who are United States citizens or residents and who

bought Toshiba laptop computers before November 8, 1999 are class members. As the

Settlement Agreement and Notices expressly explain, this includes all persons, businesses,

governmental entities, and others. As between lessees and lessors, objective terms of contracts

control. The membership of the class is clear and will be fixed permanently when this Court

enters judgment.

    B.    *Class Certification Analysis*

In <u>Treasure Chest</u> the Fifth Circuit noted that Federal Rule of Civil Procedure 23

establishes two sets of requirements for class certification. <u>See</u> 186 F.3d at 623. First, every

proposed class action must satisfy the four, well-known pre-requisites of Rule 23(a):

17

| | |
|---|---|
| *1. Numerosity:* | The class must be so large that joinder of all members is impracticable; |
| *2. Commonality:* | There must be questions of law or fact common to the class; |
| *3. Typicality:* | The named parties must have claims or defenses that are typical of the class; and |
| *4. Adequacy of Representation:* | The named parties must show that they and their attorneys will fairly and adequately protect the interest of the class. |

Second, the parties seeking class certification must show that the action is maintainable under

Rule 23(b)(1), (2), or (3). See id. In this instance, the parties seek certification under subsection

(b)(3), which sets out two more requirements:

| | |
|---|---|
| *5. Predominance:* | The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that |
| *6. Superiority:* | [A] class action is superior to other available methods for the fair and efficient adjudication of the controversy. |

Treasure Chest, 186 F.3d 623-24 (quoting Amchem, 117 S.Ct. at 2246 (quoting FED. R. CIV. P.

23(b)(3))). This Court will now consider each of these six requirements necessary for this class'

certification.

### 1.    Numerosity

First, Rule 23(a)(1) allows a class action to be maintained if "joinder of all members is

impracticable." FED.R.CIV.P. 23(a)(1). It need not be impossible to join all class members, only

difficult and inconvenient to do so. See Ardrey v. Federal Kemper Ins. Co., 142 F.R.D. 105,

110-11 (E.D. Pa. 1992). The precise number of class members need not be known. A class that

contains thousands or millions of members, as this one does, easily satisfies the numerosity

18

requirement. <u>Treasure Chest</u>, 186 F.3d at 624 (100 to 150 class members is "within the range

that generally satisfies the numerosity requirement"); <u>Durrett v. John Deere Co.</u>, 150 F.R.D. 555,

557 (N.D. Tex. 1993) (expressing "no difficulty" in concluding that the numerosity requirement

was met in light of estimates that the potential class size was as high as 14,000). "[T]he

geographical dispersion of the class" also matters. <u>Zeidman v. J. Ray McDermott & Co.</u>, 651

F.2d 1030, 1038 (5th Cir. 1981). In this case, individuals who meet the class definition reside in

all fifty states. The difficulty of joining them is clear. <u>See Treasure Chest</u>, 186 F.3d at 624-25.

In this case the requirements of Rule 23(a) of the Federal Rules of Civil Procedure are

satisfied. This class contains hundreds of thousands or possibly even millions of persons who

collectively own five million (5,000,000) Toshiba laptop computers and who reside throughout

the United States. This satisfies the numerosity requirement of Rule 23(a)(1) that the class be "so

numerous that joinder of all members is impractical."

2.    <u>Commonality</u>

Second, Rule 23(a)(2) allows a class action to be maintained if "there are questions of law

or fact common to the class." FED.R.CIV.P. 23(a)(2). A common question is one which, when

answered as to one class member, is answered as to all. <u>See Forbush v. J.C. Penney Co.</u>, 994

F.2d 1101, 1106 (5th Cir. 1993). The commonality requirement "is not demanding." <u>Treasure</u>

<u>Chest</u>, 186 F.3d at 625. It is met "where there is at least one issue, the resolution of which will

affect all or a significant number of the putative class members." <u>Id.</u> (quoting <u>Lightbourn v.</u>

<u>County of El Paso</u>, 118 F.3d 421, 426 (5th Cir. 1997)); <u>see also</u> <u>San Antonio Hispanic Police</u>

<u>Officers' Org. v. San Antonio</u>, 1999 WL 649092 at * 6 ("As long as class members are allegedly

affected by a defendant's general policy, and the general policy is the crux or focus of the

litigation, the commonality prerequisite is satisfied.").

The questions of whether the alleged FDC boundary-error problem existed, whether it constituted a breach of warranty or a violation of federal law, and the measure of economic damages to the Toshiba laptop or notebook computers and floppy diskettes flowing from that breach "are questions of law or fact common to the class" and thus satisfy the commonality requirement of Rule 23(a)(2). This satisfies the commonality requirements of Rule 23(a)(2) that there be "questions of law or fact common to the class."

### 2.   Typicality

Third, Rule 23(a)(3) allows a class action to be maintained if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED.R.CIV.P. 23(a)(3). "Like commonality, the test for typicality is not demanding." Treasure Chest, 186 F.3d at 625; see also San Antonio Hispanic Police Officers' Org. v. San Antonio, 1999 WL 649092, *6 (W.D. Tex. June 12, 1999). Typicality exists when the same "'legal and remedial theories'" support the claims of named and unnamed plaintiffs. Treasure Chest, 1999 WL 631758, at *3 (quoting Lightbourn v. County of El Paso, 118 F.3d 421, 426 (5th Cir. 1997). When the claims of both "arise[] from the same event or practice or course of conduct ... [and] are based on the same legal theory, ...[the typicality requirement] may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983) (citations omitted).

The alleged FDC boundary-error problem is the same in all the laptop or notebook computers manufactured by Toshiba. The federal law question–Title 18 U.S.C. § 1030–is identical for everyone. The affidavit of Professor White establishes that the available remedies

for breach of warranty are essentially the same for all class members. This satisfies the requirement of Rule 23(a)(3) that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."

3.  Adequacy of Representation

*Named Plaintiffs*

A named plaintiff can serve as a class representative only when he or she will fairly and adequately protect the interests of the class. For this requirement to be met, there must be no significant conflict of interests between the named plaintiff and the absent class members. See Treasure Chest, 186 F.3d at 625-26; Jenkins v. Raymark Indus., Inc., 109 F.R.D. 269, 273 (E.D. Tex. 1985), aff'd, 782 F.2d 468 (5th Cir. 1986). A sufficient alignment of interests exists when "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class." In re Corrugated Container Antitrust Litig., 643 F.2d 195, 208 (5th Cir.), aff'd following remand, 659 F.2d 1322 (5th Cir.1981), cert. denied, 456 U.S. 998, and cert. denied, 456 U.S. 1012 (1982).

Plaintiffs Ethan Shaw and Clive D. Moon took an active and participatory role in the prosecution of this litigation and had no conflicts of interest with other class members.

*Class Counsel*

The adequacy inquiry also requires an assessment of the qualifications of class counsel. Class members are entitled to be represented by attorneys who will litigate zealously on their behalf and who have the experience and ability to conclude the lawsuit successfully. See 1 HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 3.22, at 3-126.

Class Counsel prosecuted this lawsuit zealously. They were adequately experienced in

21

large litigation and financially prepared to manage it. They had no conflicts with the class; and they achieved extraordinary success. Suffice it to say, "the representative parties [have] fairly and adequately protect[ed] the interests of the class."

      4.   <u>Predominance</u>

The predominance requirement serves two functions. It assures a court that adjudicating related claims in a single proceeding will conserve resources and yield economies of scale. It also protects absent plaintiffs' rights to due process by showing that a class is cohesive.

*Economies of Scale*

Efficiency is the traditional focus of the predominance test and the distinctive justification for Rule 23(b)(3) class actions. Where significant common issues can be resolved for all claimants in a single adjudication, the advantage of a class-wide proceeding is obvious. As the Advisory Committee Note to the 1966 amendment of Rule 23 states, "[s]ubdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." FED.R.CIV.P. 23 advisory committee's note.

Class actions can yield significant economies of scale even when some issues vary from claimant to claimant. Thus, the possibility that some class members may have larger damages than others is no significant obstacle to certification. Again, the Advisory Committee Note to the 1996 Amendment to Rule 23 directly addresses this point:

> [A]s a condition for holding that a class action may be maintained under this
> subdivision [(b)(3)], [the court must find] that the questions common to the class
> predominate over the questions affecting individual members. It is only where
> this predominance exists that economies can be achieved by means of the class-
> action device. In this view, a fraud perpetrated on numerous persons by the use of

22

similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.

FED.R.CIV.P. 23 advisory committee's note.

In Treasure Chest, the Fifth Circuit expressly recognized that complete identity of claims is not required. There, cruise ship workers (aboard a ship christened the "Casino") claimed to have suffered a variety of maladies as a result of a defective ventilation system. Even though their injuries varied greatly, the Fifth Circuit upheld the trial judge's decision to certify the class. See Treasure Chest, 186 F.3d 626-27 (upholding finding of predominance). The Fifth Circuit distinguished the Treasure Chest case from other personal injury cases in which class certification was denied on several grounds that are germane to this case.

First, the panel emphasized that "the parties [would have] to produce extensive evidence regarding the Casino's air ventilation system," the common cause of the complaints. Treasure Chest, 186 F.3d at 626. In the case now before this Court, the parties will have to produce extensive evidence regarding the allegedly defective FDC, the common cause of all damages claimed by the class members.

Second, the panel noted that a single jury could decide for all claimants whether "the air quality about the Casino resulted from a negligent breach of Treasure Chest's duty to its employees or rendered the Casino unseaworthy. If Treasure Chest prevails on those two issues alone, they will prevail in the case." See Treasure Chest, 1999 WL 631758, at *4. Here, a single jury could decide whether Toshiba's laptops were defective and, if so, whether the defect entitled class members to any remedies.

Third, the panel noted that all class members' injuries were already manifest. Those who

23

were exposed but not injured were excluded from the class. <u>Treasure Chest</u>, 186 F.3d at 627. Here, the same is true. The class contains only persons who already own Toshiba laptops. Assuming that the computers are flawed, their injuries are concrete. Moreover, this particular class avoids any issue of possible, future accrued damages since it exclude and reserves claims for consequential damages.

Fourth, the panel noted that "[b]ecause all of the claims are under federal law, there are no individual choice-of-law issues." <u>Treasure Chest</u>, 186 F.3d at 627. Likewise, there are no individual choice of law issues here. The Plaintiffs allege violations of a federal statute, Title 18 U.S.C. § 1030, that is the same for all. They also state claims under sections of the Uniform Commercial Code. However, the relevant warranty laws are essentially the same in every state with respect to the claims alleged by the Plaintiffs in this case. To explore this point, a brief departure from <u>Treasure Chest</u>–and into the Uniform Commercial Code–is necessary.

Forty-nine states and the District of Columbia have enacted the Uniform Commercial Code § 2-313 regarding express warranties. The states of Maine, Minnesota, Michigan, and South Carolina adopted minor variations in the language of § 2-313, but those variations do not affect the warranty claims in this case. Louisiana did not adopt § 2-313; but Louisiana state-law establishes the same warranty principles as § 2-313.

Additionally, forty-nine states and the District of Columbia have enacted Uniform Commercial Code § 2-719 regarding limitation of warranty remedies. The states of Alabama, California, Mississippi, Vermont, and Washington adopted minor variations in the language of § 2-719, but those variations do not affect the warranty claims in this case. Louisiana did not adopt § 2-719; but Louisiana state-law establishes the same warranty principles as § 2-719.

24

Finally, a limitation of remedy to repair and replacement, such as that contained in the

Toshiba warranties in this action, may be avoided under UCC § 2-719 only if the remedy is

unconscionable or fails of its essential purpose.

Returning to Treasure Chest, the Fifth-Circuit panel fifthly pointed out that "negligence

and doctrine-of-seaworthiness claims are time-tested bases for liability." Treasure Chest, 186

F.3d at 627. So is the Uniform Commercial Code. The law under this statute is highly

developed. For decades, courts have certified product defect class actions that are similar to the

instant suit. Two recent cases are Hanlon v. Chrysler Corp., 150 F.3d 1011 (9th Cir. 1998), and

Cox v. Shell Oil, 1995 WL 775363 (Tenn.Ch. Nov. 17, 1995). In Hanlon, the Ninth Circuit

affirmed a class-action settlement of minivan owners who alleged that Chrysler mounted

defective liftgate latches in their vehicles. In Cox, the court settled as a class the claims of

thousands of homeowners who had defective polybutylene plumbing in their houses. A much

older case is Lucas v Pioneer, Inc., 256 N.W.2d 167 (Iowa 1977), which involved a class of

purchasers of defective corn seed. There are even class actions in which dissatisfied consumers

sought the remedy of rescission. See Vasquez v Superior Court, 4 Cal.3d 800, 484 P.2d 964, 94

Cal. Rptr. 796 (1971). A leading treatise summarizes the field as follows:

> Class actions involving economic damage from defective or toxic products
> include school asbestos and formaldehyde claims, as well as economic claims
> from defective products that result in fires or toxic wastes. Finally, class actions
> for product-related torts which are not of toxic nature include consumer fraud and
> breach of warranty claims.

HERBERT B. NEWBERG AND ALBA CONTE, NEWBERG ON CLASS ACTIONS § 17.22 (3d ed. 1992).

*Intra-class Cohesion*

The United States Supreme Court recently said that predominance "tests whether

25

proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Amchem</u>

<u>Products, Inc. v. Windsor</u>, 521 U.S. 591, 594 (1997). As the Fifth Circuit noted in <u>Treasure</u>

<u>Chest</u>, the class proposed in <u>Amchem</u> was too diverse to proceed. The asbestos claimants who

formed the <u>Amchem</u> class were exposed to different products from different sources over

different time periods. Some claimants had full-blown diseases; others were asymptomatic.

Conflict-of-law issues were torturous because class members came from many states. <u>See</u>

<u>Treasure Chest</u>, 186 F.3d at 626 (explaining and distinguishing <u>Amchem</u>). Similar concerns led

the Fifth Circuit to revoke the class certification in <u>Castano v. American Tobacco Co.</u>, 84 F.3d

734 (5th Cir. 1996), a cigarette case. <u>See</u> <u>Treasure Chest</u>, 186 F.3d at 626-27 (explaining and

distinguishing <u>Castano</u>).

　　　The case now before the Court looks far more like <u>Treasure Chest</u> than <u>Amchem</u> or

<u>Castano</u>. There are no latent injuries or personal injuries at issue. There are no choice-of-law

problems. Everyone's loss flows from a single source–the purchase of computers with allegedly

defective FDC's. In fact, this case is an even better candidate for certification than <u>Treasure</u>

<u>Chest</u>. Here, there are economic losses, not personal injury claims. Courts have been reluctant

to certify personal injury classes but have consistently certified classes involving economic

harms. Class certification in securities cases is practically routine. *See* T. Willging, et al.,

*Empirical Study of Class Actions in Four District Courts: Final Report to the Advisory*

*Committee on Civil Rules* 17 (Federal Judicial Center 1996) (reporting class certification rates in

securities cases ranging from 94% to 100%). Here, there is only a single possible cause of the

injuries—the allegedly defective microcode in the FDC's. In <u>Treasure Chest</u>, other causes were

possible, such as allergies, smoking, and pre-existing medical conditions. The problems of

varying exposure to the ventilation system and differing injuries had to be dealt with in Treasure

Chest, too.  By comparison, this case is free of such complications.  Simply put, the

predominance test is met.

        5.    Superiority

    When a dispute could conceivably be handled in any of several ways, the superiority

requirement allows a trial court to certify a (b)(3) class when this is reasonably thought to be the

most practical and sensible manner of proceeding.  The factors that bear on this assessment are:

(i) the interest, if any, that class members have in controlling the prosecution of separate actions;

(ii) the pendency of other litigation involving class members; (iii) the desirability of

concentrating the litigation in a single forum; and (iv) the ease or difficulty of managing a class

action. See FED.R.CIV.P. 23(b)(3)(A)-(D).

    This case also meets the superiority test of Rule 23(b)(3).  Given the identity of the legal

and factual issues, the suggestion that laptop owners should file thousands or millions of

individual lawsuits is preposterous and would constitute an egregious waste of judicial resources

and private resources.  Since it would be economically unreasonable for many class members to

adjudicate their separate claims individually in any event, the superiority of a class action is

evident.  The critical and identical factual issues require substantial discovery, expert testimony,

and trial time.  There is no possible reason for wanting these issues to be developed repeatedly *ad

infinitum* by individual claimants.

    Additionally, the four factors identified in Rule 23(b)(3) all favor certification of the

proposed settlement class.  The "interest of members of the class in individually controlling the

prosecution or defense of separate actions" is minimal in this case because the cost of pursuing

any individual or separate action would, for the vast majority of class members, grossly exceed any recovery that they could obtain outside of the class-action process. At the time this case was filed it was the only case of its nature and it remains the only case of its type against these Defendants. So, this court did not have to consider the effect on the class of "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." A trial of this matter could have resolved in a single action the question of whether the Defendants had breached the express warranty owing to each of the class members and determined the damages owing to the class members by virtue of the similarity of the laws governing recovery for breach of express warranty in the various States. Any fragmentation or separation of the litigation into other jurisdictions would have increased the costs to the class and the Defendants and possibly have caused conflicting results, increasing legal costs and delay associated with resolving such conflicts. Thus, an evaluation of "the desirability or undesirability of concentrating the litigation of the claims in a particular forum" and "the difficulties likely to be encountered in the management of a class action" both favor certifying the proposed class.[13]

For all of these reasons, this Court finds the proposed class satisfies the requirements of Federal Rule of Civil Procedure 23. Accordingly, this Court CERTIFIES this class under Federal Rule of Civil Procedure 23(b)(3).

--------

[13]Additionally, the Plaintiffs' complaint specifically seeks injunctive relief against the Defendants for violation of Title 18 U.S.C. § 1030 and sought a determination that the presence of the allegedly defective FDC in the Toshiba laptop or notebook computers constituted a breach of the manufacturer's express warranty. These claims, coupled with the satisfaction of the Rule 23(a) requirements, are sufficient to certify a class under Federal Rule of Civil Procedure 23(b)(2).

### 3.  The Proposed Settlement Agreement Is Fair, Adequate and Reasonable

"In determining whether to approve a proposed settlement, the cardinal rule is that the

District Court must find that the settlement is fair, adequate and reasonable." In re Corrugated

Container Antitrust Litigation, 643 F.2d 195, 207 (5th Cir. 1981) ("In re Corrugated") (quoting

Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977)).

> The Fifth Circuit has identified six factors which the district court must examine
> in determining whether a proposed settlement meets this goal: (1) the existence of
> fraud or collusion behind the settlement; (2) the complexity, expense, and likely
> duration of the litigation; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the probability of plaintiffs' success on the merits;  (5)
> the range of possible recovery; (6) the opinions of the class counsel, class
> representatives, and absent class members.

In re Lease Oil Antitrust Litigation, 186 F.R.D. 403, 431 (S.D. Tex. 1999) (citing Reed v.

General Motors Corp., 703 F.2d 170, 172 (5th Cir. 1983)).

When assessing the fairness of a proposed class settlement, the trial judge "must not try

the case in the settlement hearings because the very purpose of the compromise is to avoid the

delay and expense of such a trial." Reed, 703 F.2d at 172.

> The very uncertainty of outcome in litigation, as well as the avoidance of wasteful
> litigation and expense, lay behind the Congressional infusion of a power to
> compromise [i.e., behind the creation of Rule 23(e)]. This is a recognition of the
> policy of the law generally to encourage settlements.  This could hardly be
> achieved if the test on hearing for approval meant establishing success or failure
> to a certainty.

In re Corrugated, 643 F.2d at 212.

First, this Court finds it unreasonable to believe that a settlement in excess of $1.0 billion

($1,000,000,000.00) was the result of collusion between the parties or anything else other than

arms-length negotiations.  For example, this Court specifically recalls the drafting of its *June 7*,

*1999 "Docket Control Order"* [20]. The Plaintiffs and Toshiba submitted proposed docket-control orders that were so inapposite it was necessary to have two status conferences in an (overly optimistic) effort to reconcile their differences. *See id.* Then, the parties sparred over numerous discovery issues (including initial disclosures) before the Honorable Wendell C. Radford. Finally, the parties engaged in a heavily-briefed summary-judgment battle concerning the proper application of Title 18 U.S.C. § 1030. Suffice it to say the Plaintiffs and Toshiba began, continued, and ended this lawsuit at arms-length. Thus, the arms-length nature of these proceedings supports approval of the proposed Settlement Agreement.

Second, the considerable complexity and expense inherent in this particular case support approval of the proposed Settlement Agreement. The alleged FDC boundary-error problem itself is considerably complex, requiring technical expertise to isolate (let alone explain) the alleged condition. Moreover, Plaintiffs brought this lawsuit, in part, under Title 18 U.S.C. § 1030. In denying Toshiba's and NEC's motions for partial summary judgment under Title 18 U.S.C. § 1030, this Court specifically noted "there are 'very few cases which construe Title 18 U.S.C. § 1030 at all.'" *Order Denying Motions for Partial Summary Judgment* [99] at p.16 (quoting North Texas Preventative Imaging v. Eisenberg, 1996 U.S.Dist. LEXIS 19990 *7 (C.D. Cal. August, 19, 1996)). Finally, this Court specifically recalls the voluminous motions, briefs, and other documents filed at considerable expense to the parties in this particular case–all of which were exceptionally prepared. Thus, the complexity, expense, and likely duration of this highly technical and innovative case support approval of the proposed Settlement Agreement.

Third, the current stage of the proceedings and the amount of discovery completed support approval of the proposed Settlement Agreement. Plaintiffs filed this lawsuit on March 5,

1999 and, considering the serious nature of Plaintiffs' allegations, this Court set it on accelerated

docket for jury trial on April 10, 2000. Plaintiffs have now survived a heavily-briefed and hotly-

disputed summary-judgment motion brought by all Defendants who forcefully (albeit

erroneously) argued that Title 18 U.S.C. § 1030 could not be used to support Plaintiffs'

allegations. Today, Plaintiffs have poured over millions of documents (many of which were in

Japanese) and a mountain of magnetic and optical media containing millions of entries relating to

product design, alleged defects, complaints, and other issues relevant to the Plaintiffs'

allegations. The progression of this case on this Court's docket–combined with the voluminous

discovery completed–support approval of the proposed Settlement Agreement.

Fourth, the probability of plaintiffs' success on the merits also supports approval of the

proposed Settlement Agreement. Although Plaintiffs maintain they would likely be successful

on the merits at trial, the complicated nature of the alleged FDC boundary-error problem, the

application of a relatively new federal statute, Title 18 U.S.C. § 1030, and the vigorous defense

presented by Toshiba–all lend support to this Court's approval of the proposed Settlement

Agreement.

Fifth, the range of possible recovery in this case also supports approval of the proposed

Settlement Agreement. If Toshiba's limitation of remedies under UCC § 2-719 had been

established at trial, the class members' only remedy may have been a repair or replacement. To

the extent that the Plaintiffs recovered cash payments for class members in this settlement, they

may have recovered more than they would have recovered had the matter been tried on its merits.

The class members can be compensated according to the age and warranty status of the

computers in question, thereby providing a simple, objective quantification of damages, unlike

31

the situation in personal injury actions such as Amchem v. Windsor, 521 U.S. 591 (1997).

Additionally, the class members' non-consequential damages can be determined based on when

they purchased a computer containing the alleged FDC boundary-error problem.  Any possible

ability of this alleged FDC boundary-error problem occurring has been eliminated and will not

appear in Toshiba laptop or notebook computers manufactured in the future.  Finally, if the

Plaintiffs obtained a judgment against Toshiba in excess of the value of its assets in the United

States, it would be difficult to collect that judgment from the assets of Toshiba located in Japan.

     A settlement should not be disapproved simply because it contains an in-kind benefit

component if the benefits are of real, economic value to the class members.  The in-kind relief

made available as a result of the proposed Settlement Agreement provide significant value to

class members.  This is true not only of the software patch, external floppy disk drive, and

hardware fix to which they are entitled; it is also true of the coupons (the "Toshiba Bucks").  The

Toshiba Bucks are designed to be as much like cash as possible.  The only significant difference

between Toshiba Bucks and cash is that Toshiba Bucks can be used to purchase only Toshiba

products.  Although this difference diminishes the value of the coupons somewhat, the economic

value that remains is quite substantial.  Additionally, the placing of Toshiba Bucks on electronic

media further enhances their value.  The versatile coupon program used in this case can serve as

a model for the design of coupons in class-action settlements.  The obligations imposed upon

Toshiba under the terms of the proposed Settlement Agreement, even if one ignores the cash-

payment obligations, constitute real and quantifiable value to the class members and should be

included in determining the total economic value provided to the class by virtue of the proposed

Settlement Agreement.

32

Sixth, and finally, the opinions of Class Counsel, Class Representatives, and absent class members all support approval of the proposed Settlement Agreement. Class Counsel and Class Representatives Shaw and Moon all support approval of the proposed Settlement Agreement. Additionally, this Court takes judicial notice that, despite a potential class of thousands–if not millions–of owners of roughly five million (5,000,000) Toshiba laptop computers, fewer than thirty (30) objections were filed in response to the well-publicized announcement of this proposed Settlement Agreement. Also, the proposed Settlement Agreement treats class members solely by objective criteria triggered by the age of their computers and whether the warranty is still in place; therefore, there are no intra-class conflicts such as those that occurred in Amchem and Ortiz. This court, therefore, concludes that there are no varying interests within this class that warrant the creation of subclasses. Additionally, Class Counsel do not have competing duties with respect to any hypothetical subsets of the class because the award to Class Counsel is not based upon the recovery of any particular subgroup of claimants. Finally, the charity created by this settlement does not harm the class members because the charity receives funds only after all class members making claims have been paid pursuant to the proposed Settlement Agreement.

For all of these reasons, this Court finds the proposed Settlement Agreement is fair, adequate, and reasonable.

### 4. Attorneys' Fees in Class Actions

It is not the critic who counts, not the man who points out how the strong man stumbled, or where the doers of deed could have done better. The credit belongs to the man who is actually in the arena: whose face is marred by the dust and sweat and blood; who strives valiantly; who errs and comes short again and again ... who knows the great enthusiasms, the great devotions and spends himself in a worthy cause; who, at the best, knows in the end the triumph of high achievement; and who, at the worst if he fails, at least fails while daring greatly, so that his

33

place shall never be with those cold and timid souls who know neither victory or defeat—Theodore Roosevelt.

In addition to seeking approval of the approximately $2.1 billion ($2,100,000,000.00) Settlement Agreement, the parties ask this Court to approve an award of $147.5 million ($147,500,000.00) in attorneys' fees. It will.

A.    *The Court's Duty to Assess the Reasonableness of Attorneys' Fees in Class Actions*

Rule 23(e) says, in its entirety:

A class action *shall not be dismissed or compromised without the approval of the court*, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs.

FED.R.CIV.P. 23(e) (emphasis added). Obviously, there is a "duty under Rule 23 to protect absent class members and to police class action proceedings." Strong v. Bellsouth Telecommunications, Inc., 137 F.3d 844, 849 (5th Cir. 1998). This duty extends beyond the bounds of merely reviewing the substantive terms of the proposed settlement. Indeed, "the duty to investigate the provisions of the suggested settlement includes the obligation to explore the manner in which fees of class counsel are to be paid and the dollar amount for such services." Foster v. Boise-Cascade, Inc., 420 F. Supp. 674, 680 (S.D. Tex. 1976), aff'd, 577 F.2d 335 (5th Cir. 1978). "To fully discharge its duty to review and approve class action settlement agreements, a district court must assess the reasonableness of the attorneys' fees." Strong, 137 F.3d at 849 (citing Piambino v. Bailey, 610 F.2d at 1306). Moreover, an examination of attorneys' fees protects against the public perception that attorneys exploit the class action to obtain large fees at the expense of the class. Id. (citing In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig., 55 F.3d 768, 820 (3rd Cir. 1995) (emphasizing that the

34

"court's oversight function" serves to detect "potential public misunderstandings that they may

cultivate in regard to the interests of class counsel") and Foster, 420 F.Supp. at 680 (explaining

that the court has the "obligation in any Rule 23 class action to protect [the class action device]

from misuse" because "the most commonly feared abuse is the possibility that Rule 23

encourages strike suits promoted by attorneys who simply are seeking fat fees")).  So how does

this Court "assess the reasonableness of the attorneys' fees?"  Once again, so glad you asked . . .

> B.      *The United States Supreme Court Approves the Percentage Method for Assessing*
> *The Reasonableness of Attorneys' Fees in Common-Fund Class Actions*

Since 1882 the United States Supreme Court has consistently held that a person who

successfully maintains a lawsuit that creates a common fund is entitled to a reasonable

compensation.  See Trustees v. Greenough, 105 U.S. 527 (1882).  The Supreme Court explicitly

recognized an attorney's right to receive a reasonable fee from a common fund in Central

Railroad & Banking of Georgia v. Pettus, 113 U.S. 116 (1885).  The United States Supreme

Court:

> This Court has recognized consistently that a litigant or lawyer who recovers a
> common fund for the benefit of persons other than himself or his client is entitled
> to a reasonable attorneys' fee from the fund as a whole.  Jurisdiction over the fund
> involved in the litigation allows a court to prevent . . . inequity by assessing
> attorney's fees against the entire fund, thus spreading fees proportionately among
> those benefitted by the suit.

Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980).

The United States Supreme Court has consistently held that the percentage method is a

proper method for assessing the reasonableness of attorneys' fees in common fund cases.  See

Pettus, 113 U.S. at 124-25 (citing Greenough, 105 U.S. 527 (1881)); Sprague v. Ticonic Natl.

Bank, 307 U.S. 161, 166-67 (1939).  "The underlying justification for attorney reimbursement

from a common fund, as explained by the Supreme Court in three early cases, is that unless the costs of litigation are spread to the beneficiaries of the fund they will be unjustly enriched by the attorney's efforts." Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1265 (D.C.Cir.1993) (citing Sprague, 307 U.S. at 166-67; Pettus, 113 U.S. at 126-27; and Greenough, 105 U.S. at 532)). By 1984, when the Supreme Court decided Blum v. Stemson, 465 U.S. 886, 900 n.16 (1984), the point that "under the 'common fund doctrine' . . . a reasonable fee is based on a percentage of the fund bestowed on the class" was so well settled that no more than a footnote was needed to make it.

But a different fee formula exists, too. Dubbed the "lodestar method," it bases fees on time expended, hourly rates, and a specified number of enhancement factors. Courts often use the lodestar method to set the size of fee awards that losing parties must pay to prevailing parties pursuant to fee award statutes and to set fees in class actions that settle without creating a common fund.

"[T]he Supreme Court [has] *never* formally adopted the lodestar method in a common fund case." MANUAL FOR COMPLEX LITIGATION (THIRD) § 24.12 198 (1995) (emphasis added). "Unlike in a statutory fee analysis, where the lodestar is generally determinative, in a percentage fee award [from a common fund] *the amount of time may not be considered at all*." Id. § 24.121, at 191 (emphasis added). Even when hours expended receive some weight, "the factor given the greatest emphasis is the size of the fund created, because 'a common fund is itself the measure of success . . . [and] represents the benchmark from which a reasonable fee will be awarded." Id. § 24.121, p.191, n.580 (quoting 3 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 14-4 (3d ed. 1992)). Finally, in a recent, unanimous opinion, the United States

36

Supreme Court suggested it would reject any suggestions that the lodestar method must be applied in common-fund cases. See Venegas v. Mitchell, 495 U.S. 82 (1990) (holding that a plaintiff in a civil rights suit may be contractually bound to pay an attorney a percentage of the recovery even though the fee exceeds the statutory fee that the defendant must pay to the plaintiff). So the United States Supreme Court has consistently held the percentage method is proper in common-fund cases. But what about the circuit courts?

C.      *The Majority of Circuit Courts Use the Percentage Method to Assess the Reasonableness of Attorneys' Fees in Common-Fund Class Actions*

Not surprisingly, "the trend [among federal courts] has been toward the percentage of the fund method." MANUAL FOR COMPLEX LITIGATION (THIRD) (1995). The Federal Judicial Center sponsored an empirical study that later confirmed this observation. *See* Thomas E. Willging, Laural L. Hopper, & Robert J. Niemic, *An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges*, 71 N.Y.U. L. REV. 74, 156 (1996). Indeed, in 1985, a task force appointed by the U.S. Court of Appeals for the Third Circuit led by Professor Arthur Miller of the Harvard Law School described the lodestar method as "cumbersome, enervating and often surrealistic process of preparing and evaluating fee petitions that now plagues the Bench and Bar." *Court Awarded Attorney Fees, Report of the Third Circuit Task Force* ("*Third Circuit Task Force Report*"), 108 F.R.D. 237, 255 (1986).

The Eleventh Circuit, which follows the Fifth Circuit precedent on fee awards, has used the same approach. In Waters v. International Precious Metals Corp., 190 F.3d 1291 (11th Cir.1999), the trial judge set a benchmark fee of thirty percent (30%) and awarded a modest lodestar-based upward enhancement, so that the final percentage was thirty three and one third

percent (33.3%). The Eleventh Circuit affirmed both the discretion of the trial court to use this method and the reasonableness of the fee. See id.

Today, the First, Third, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuit Courts, along with the District of Columbia, either allow judges to use the percentage method or require them to do so. See In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 304-08 (1st Cir. 1995); In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig., 55 F.3d 768, 822 (3rd Cir. 1995); Londgen v. Sunderman, 979 F.2d 1095 (5th Cir. 1992); Rawlings v. Prudential-Bache Properties, Inc., 9 F.3d 513, 516 (6th Cir. 1993); Florin v. Nationsbank of Georgia, 34 F.3d 560, 565-67 (7th Cir. 1994); Johnston v. Comerica Mort. Corp., 83 F.3d 241, 246 (8th Cir. 1996); In re Washington Public Power Supply Systems Sec. Litig., 19 F.3d 1291, 1296 (9th Cir. 1994); Gottlieb v. Barry, 43 F.3d 474, 483 (10th Cir. 1994); Camdem I, 946 F.2d at 771-74 (11th Cir.1991); Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1267-71 (D.C. Cir. 1993).

   D.   *The Percentage Method is Superior to the Lodestar Method for Assessing the Reasonableness of Attorneys' Fees in Common-Fund Class Actions*

The lodestar method voraciously consumes enormous judicial resources, unnecessarily complicates already complex litigation, and inaccurately reflects the value of services performed. First, "[t]he lodestar method makes considerable demands upon judicial resources since it can be exceptionally difficult for a court to review attorney billing information over the life of a complex litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable." Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1269-70 (D.C. Cir. 1993). The United States Supreme Court itself warned that a "request for attorney's fees should

38

not result in a second major litigation." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).

Second, as the Seventh Circuit observed:

> The contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains...The unscrupulous lawyer paid by the hour may be willing to settle for a lower recovery coupled with a payment for more hours. Contingent fees eliminate this incentive and also ensure a reasonable proportion between the recovery and the fees assessed to defendants.

In re Continental Illinois Sec. Litig., 962 F.2d 566, 572 (7th Cir.1992). Simply put, the lodestar method encourages class-action attorneys to drag their fee to the detriment of their respective classes. Finally, as Judge Vance of the Fifth Circuit noted in a separate opinion in Foster v. Boise-Cascade, Inc., 577 F.2d 335, 337 n.1 (5th Cir.1978):

> The hourly rate approach...frequently [bears] little or no relationship to the value of the services performed in anything but the most routine work. A flash of brilliance by a trial lawyer may be worth far more to his clients than hours or days of plodding effort. Few among us would contend that an operation by a gifted surgeon who removes an appendix in fifteen minutes is worth only one sixth of that performed by his marginal colleagues who require an hour and a half for the same operation.

Again, simply put, the lodestar method rewards plodding mediocrity and penalizes expedient success.

As already noted, the Third Circuit Task Force–spear-headed by Professor Arthur Miller of the Harvard Law School–previously denounced the use of the lodestar method for assessing the reasonableness of attorneys' fees in common-fund class actions. The task force listed nine deficiencies in the lodestar method:

> 1)   the lodestar method "increases the workload of an already overtaxed judicial system";[14]

---

[14]With first-hand knowledge this Court wholeheartedly agrees with this proposition.

2)      the lodestar elements "are insufficiently objective and produce results that are far from homogeneous";

3)      the lodestar method "creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of the law";

4)      the lodestar method "is subject to manipulation by judges who prefer to calibrate fees in terms of percentages of the settlement fund or the amounts recovered by the plaintiffs or of an overall dollar amount";

5)      although crafted to prevent abuses, the lodestar method has simply led to other abuses, like "encouraging lawyers to expend excessive hours engag[ing] in duplicative and unjustified work, inflat[ing] their 'normal' billing rate[s], and includ[ing] fictitious hours";

6)      the lodestar method "creates a disincentive for the early settlement of cases";

7)      the lodestar method "does not provide the district court with enough flexibility to reward or deter lawyers so that desirable objectives, such as early settlement, will be fostered";

8)      the "lodestar" is set lower in civil rights cases than in securities and antitrust cases and, consequently, "works to the disadvantage of the public interest bar"; and

9)      despite the superficial appearance of simplicity in the lodestar approach (hours x fees + enhancements), "considerable confusion and lack of predictability remain in its administration."

*Third Circuit Task Force Report*, at 246-49. Suffice it to say the Third Circuit Task Force was

not impressed with the lodestar method for assessing the reasonableness of attorneys' fees in

common-fund class actions. Indeed, the lodestar method thwarts the main objective in awarding

attorneys' fees. The Honorable Richard A. Posner, Chief Judge for the Seventh Circuit: "The

object in awarding a reasonable attorney's fee...is to stimulate the market . . . The class counsel

are entitled to the fee they would have received had they handled a similar suit on a contingent

fee basis, with a similar outcome, for a paying client." In Re Continental Securities Litigation,

962 F.2d 566, 572 (7th Cir. 1992).

      E.      *The Fifth Circuit Permits the Percentage Method for Assessing the*
           *Reasonableness of Attorneys' Fees in Common-Fund Class Actions*

      Does the Fifth Circuit use the percentage or lodestar method for assessing the

reasonableness of attorneys' fees in common-fund class actions?  Admittedly, it's not entirely

clear.  "Despite the apparent advantages of the percentage fee method over the lodestar method in

common fund cases, the law in the Fifth Circuit concerning which method should be applied is

'at best unclear.'"  In re Harrah's Entertainment, Inc. Sec. Litg., 1998 WL 832574 (E.D. La.,

Nov. 25, 1998) (unpublished) (citing In re Combustion, Inc., 968 F.Supp. 1116, 1134 (W.D. La.

1997)).

      Here's why it's unclear in the Fifth Circuit.  In 1974 the Fifth Circuit suggested twelve

factors to be examined when evaluating attorneys' fees in a statutory award case, or "fee-

shifting" case.  Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974).

The twelve Johnson factors are:

        1)      the time and labor required,
        2)      the novelty and difficulty of the issues,
        3)      the skill required to perform the legal services properly,
        4)      the preclusion of other employment,
        5)      the customary fee,
        6)      whether the fee is fixed or contingent,
        7)      time limitations imposed by the client or the circumstances,
        8)      the amount involved and the results obtained,
        9)      the experience, reputation, and ability of the attorneys,
        10)    the undesirability of the case,
        11)    the nature and length of the professional relationship with the client, and
        12)    awards in similar cases.

Johnson, 488 F.2d at 717-19.  Later, the Fifth Circuit extended the Johnson factors to cases

involving attorneys' fees from a settlement fund where the attorney had already entered into a

41

contingency fee contract with the plaintiff. See Combustion, 968 F.Supp. at 1134 (citing Hoffert v. General Motors Corp., 656 F.2d 161 (5th Cir. 1981) and In re Catfish Litigation, 939 F.Supp. 493, 501-03 (N.D. Miss.1994)). "The Fifth Circuit continued this blending of approaches for fee determination in an effort to combine the best features of the lodestar, percentage, and Johnson factors." Combustion, 968 F.Supp. at 1135 (citing 1 CONTE, ATTORNEY FEE AWARDS, § 2.04).

By 1992 the blend was complete. The Fifth Circuit began with the basic lodestar method: "Under the lodestar method, which this circuit uses to assess attorneys' fees in class action suits, the district court must first determine the reasonable number of hours expended on litigation and the reasonable hourly rates for the participating attorneys." Strong, 137 F.3d at 850 (citing Forbush v. J.C. Penney Co., 98 F.3d 817, 821 (5th Cir. 1996). Then the Fifth Circuit blended the lodestar and Johnson analysis into a class action that was not a traditional common-fund class action: "the lodestar is computed by multiplying the number of hours reasonably expended by the reasonably hourly rate. See id. Upon a review of the twelve factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), the court may then apply a multiplier to the lodestar, adjusting it either upward or downward. See id. However, "'[t]he lodestar may be adjusted according to a Johnson factor only if that factor is not already taken into account by the lodestar.'" Id. (citing Transamerican Natural Gas Corp. v. Zapata Partnership, Ltd. (In re Fender), 12 F.3d 460, 487 (5th Cir. 1994)).

Not only was the blend complete in the Fifth Circuit by 1992, it arguably solidified that very same year: "Although the prevailing trend in other circuits and district courts has been towards awarding fees and expenses in common fund cases based on percentage amounts, the Fifth Circuit has yet to adopt this method." Longden v. Sunderman, 979 F.2d 1095, 1099 (5th

Cir. 1992); see also Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 324 (5th Cir. 1995);

Copper Liquor, Inc. v. Adolph Coors Co., 684 F.2d 1087, 1092 (5th Cir. 1982).  Nevertheless,

numerous district courts within the Fifth Circuit continue to use the percentage method for

evaluating attorneys' fees in common fund cases.  See In re Catfish Antitrust Litigation, 939

F.Supp. 493, 500 (N.D. Miss. 1996) lists the following cases as examples:

1)  Orzel v. Gilliam, Civil Action No. 3:90-CV-0044-G (N.D. Tex. May 16, 1995) (Judge Fish);

2)  In re Prudential-Bache Energy Income Partnerships Securities Litigation, No. 888, 1994 WL 202394, at *1 (E.D. La. May 18, 1994) ("Prudential I");

3)  Steiner v. Phillips, Civil Action No. 3:89-1387-X (N.D. Tex. Mar. 14, 1994) (Judge Kendall);

4)  In re Shell Oil Refinery, 155 F.R.D. 552 (E.D. La.1993);

5)  Belman v. Warrington, Civil Action No. H-91-3767 (S.D. Tex. Nov. 16, 1993);

6)  In re Intellicall Securities Litigation, Civil Action No. 3:91-CV-0730-P (N.D. Tex. September 22, 1993) (Judge Solis);

7)  Kleinman v. Harris, Civil Action No. 3:89-CV-1869-X (N.D. Tex. June 21, 1993);

8)  In re First Republic Bank Securities Litigation, Civil Action No. 3:88-CV-0641-H (N.D. Tex. Feb. 28, 1992 and March 8, 1993) (Judge Sanders);

9)  Transamerica Refining Corp. v. Dravo Corp., Civil Action No. H-88-789 (S.D. Tex. Nov. 16, 1992) (Judge Black);

10)  In re Granada Partnerships Securities Litigation, MDL No. 837 (S.D. Tex. Oct. 16, 1992);

11)  In re Lomas Fin. Corp. Securities Litigation, Civil Action No. CA-3-89-1962-G (N.D. Tex. Jan. 28, 1992);

12)  In re Middle S. Util. Securities Litigation, 1991 LEXIS 18062 (E.D. La. Dec. 17, 1991);

13)     Rywell v. Healthvest, CA-3-89-2394-H (N.D. Tex. Dec. 3, 1991);

14)     Longden v. Sunderman, Civil Action No. 3-87-0612-H (N.D. Tex. May 1, 1991)
        (Judge Sanders), aff'd, 979 F.2d 1095 (5th Cir.1992);

15)     Teichler v. DSC Communications Corp., CA-3-85-2005-T (N.D. Tex. Oct. 22,
        1990); and

16)     Finkel v. Docutel/Olivetti Corp., CA-3-84-0566-T (N.D. Tex. Feb. 23, 1990).

District court judges have also used the percentage method in other cases that are not on the

Catfish list. See Nickle v. Crown Life Ins. Co., Civil Action No., 7-96-238 (S.D. Tex. 1997)

(Judge Black); Gonzalez v. Crown Life Ins. Co., Civil Action No. M-97-156 (S.D. Tex. 1997)

(Judge Lake); Metzgar v. The Equitable Life Assurance Society of the U.S., Civil Action No.

CA4-82-413-K (N.D. Tex. 1988) (Judge McBryde).

        But how can district courts in the Fifth Circuit use the percentage method in common-

fund cases when the Fifth Circuit has expressly opined that it uses the lodestar method "to assess

attorneys' fees in class action suits?" Strong, 137 F.3d 844, 850 (5th Cir.1998). Well, as the

Fifth Circuit itself expressly observed, the settlement in Strong did not create "a traditional

common fund." Id. at 852. Specifically, although "[p]laintiffs' counsel calculated that if every

class member were eligible for and elected to receive the credit, BellSouth's liability would

amount to approximately $64 million," Strong, 137 F.3d at 847, the trial judge was not

convinced. Quite the contrary, the trial judge "voiced concern . . . that the $64 million 'common

fund' figure was 'illusory' and refused to award anything in fees." Id., 137 F.3d at 848. The

Fifth Circuit, finding no abuse of discretion, affirmed the trial judge.[15]

_____

        [15]Indeed, the Fifth Circuit has *never* (knock on wood) reversed a district court judge's
decision to award a fee as a percentage. Quite the contrary, in Londgen v. Sunderman, 979 F.2d

In Strong, the Fifth Circuit highlighted the difference between the common-fund class

action and other class actions.  The Fifth Circuit expressly reserved the question whether an

analysis other than the lodestar method should be applied to determine the award of attorneys'

fees in a common-fund class action.  The Fifth Circuit explained:

> We first question whether Boeing, [Boeing v. Van Gemert, 444 U.S. 472 (1980)]
> which used the percentage of fund method, has any application to a case such as
> this one, which uses the lodestar method. *Without deciding the implications, if*
> *any, of Boeing on the lodestar method, however, we find Boeing distinguishable*
> *on a more significant ground: unlike Boeing, this case does not involve a*
> *traditional common fund.*

Strong, 137 F.3d at 852 (footnote omitted) (emphasis added).

If squarely confronted with the issue, as it would be if the fee award in this case were on

appeal, the Fifth Circuit might choose to apply a different analysis for assessing attorneys' fees in

common-fund class actions.  One choice would be to follow the Supreme Court in Boeing and

apply the percentage of fund analysis (the "percentage method").  Another choice would be to

accept the hybrid analysis recently adopted by some district courts in the Fifth Circuit and by the

Eleventh Circuit.  These courts used the percentage method to set a benchmark fee and then

adjusted that fee up or down based on the Johnson factors.  For example, in In re Harrah's

Entertainment, Inc. Sec. Litig., 1998 WL 832574 (E.D. La., Nov. 25, 1998) (unpublished), a

post-Strong case, after thoroughly reviewing the leading decisions the trial judge concluded that

"the Fifth Circuit recognizes the propriety of the percentage fee method where each member of a

class has an 'undisputed and mathematically ascertainable claim to part of [a] judgment.'" 1998

---

1095 (5th Cir.1992), the Fifth Circuit *affirmed* a percentage fee award in a securities class action,
noting that the district court had stated its preference for the percentage-of-recovery method "as a
matter of policy." Id.

WL 832574 at *3-4 (quoting <u>Strong</u>, 137 F.3d at 852) (quoting <u>Boeing Co. v. Van Gemert</u>, 444

U.S. 478, 479 (1980)). The trial judge then set a benchmark fee of twenty-five percent (25%)

and adjusted it in light of the <u>Johnson</u> factors, including time expended.

Other district courts have done the same in other post-<u>Strong</u> cases. In <u>In re Lease Oil</u>

<u>Antitrust Litig.</u>, 1999 WL 323373 *45 (S.D. Tex., May 10, 1999), the district court approved a

benchmark fee of twenty-five percent (25%) and performed a lodestar check. In an unreported

order in <u>Courtney v. American Airlines, Inc.</u>, No. 4:97-CV-668-A (N.D. Tex., Sept. 3, 1999), the

trial judge did the same.

In rendering its opinion, this Court must be mindful that the Fifth Circuit could choose to

apply any of these methods if it is called on to review this Court's award of attorneys' fees in this

case. Out of an abundance of caution this Court will apply all three methods and compare the

results given by each before reaching its decision on the amount of attorneys' fees that would be

fair, just, and reasonable in this case.

F.   *Analyses*

This case is a traditional, common-fund class action. However, this Court will cautiously

apply all three methods for assessing the reasonableness of attorneys' fees: the lodestar /

<u>Johnson</u> factor analysis, the percentage method, and the hybrid analysis.

1.   Lodestar / <u>Johnson</u> Factor Analysis

The lodestar is computed by multiplying the number of hours reasonably expended by the

reasonable hourly rate. See <u>Forbush</u>, 98 F.3d at 821. Upon a review of the twelve factors set

forth in <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714, 717-19 (5th Cir. 1974), this

Court may then apply a multiplier to the lodestar, adjusting the lodestar either upward or

downward. See id. However, "the lodestar may be adjusted according to a Johnson factor only if

that factor is not already taken into account by the lodestar." Transamerican Natural Gas Corp. v.

Zapata Partnership, Ltd. (In re Fender), 12 F.3d 480, 487 (5th Cir. 1994).

Again, the twelve Johnson factors are:

1) the time and labor required,
2) the novelty and difficulty of the issues,
3) the skill required to perform the legal services properly,
4) the preclusion of other employment,
5) the customary fee,
6) whether the fee is fixed or contingent,
7) time limitations imposed by the client or the circumstances,
8) the amount involved and the results obtained,
9) the experience, reputation, and ability of the attorneys,
10) the undesirability of the case,
11) the nature and length of the professional relationship with the client, and
12) awards in similar cases.

Johnson, 488 F.2d at 717-19.

This litigation has placed an extraordinary burden on this Court, Class Counsel, and

Counsel for Toshiba. This Court reaches this conclusion based on the evidence submitted and its

own observations and experiences throughout the progress of this action. For many reasons, it

has been necessary to prosecute this action continuously, around the clock, seven days a week,

workdays and holidays alike.

First, due to the seriousness of the Plaintiffs' allegations, this Court set this case on an

aggressive schedule. The parties were given less than ten months to prepare for a hearing on

class certification and a hearing on Plaintiffs' request for injunctive relief. See *June 7, 1999*

*"Docket Control Order"* [20]. That same schedule allowed just over four months to prepare for

trial after the hearing on certification and injunctive relief. Id. As a result, the parties had no

47

time to waste preparing this case for hearing and trial.

Second, the headquarters for the ultimate parent corporations of all the Defendants were located in Tokyo, Japan. As the workday ends in Beaumont it's just beginning in Tokyo. Consequently, work on this case could and did continue around the clock.

Third, the discovery materials produced by defendants in this case presented Class Counsel with a monumental task. Class Counsel reviewed more than two million (2,000,000) pages of documents produced by the Defendants. Many of these documents were in the Japanese language and had to be translated into English before they could be reviewed. Moreover, Toshiba produced mountains more information on magnetic storage devices including videotapes, floppy disks, optical disks, high capacity removable magnetic disks of various kinds, and various forms of digital backup tapes. Some of the information produced on magnetic and optical media included over 250,000 e-mails; millions of database entries dealing with warranty issues, technical service issues, and complaints; and hundreds of thousands of pages of technical documents. To further complicate matters, the data was stored in file formats that could only be accessed by certain computer systems or specialized software. In some cases the data was stored in a form that could only be accessed by computer operating systems available only in Japan. Before the data could even be seen by the human eye it had to be converted and retrieved from the magnetic and optical media with great effort. In some cases, even after the data was converted and retrieved, it had to be translated from Japanese to English. Finally, even after translation to English, many technical documents required careful review and interpretation by experts or technically trained counsel to determine if they had any significance.

48

Fourth, the task of preparing for and conducting depositions was also made more difficult than usual because of the need to translate much of the questioning and testimony. Many of the exhibits had to be translated from English to Japanese or vice versa.

Fifth, the parties were required to attend many hearings and prepare extensive briefing on legal issues including a massive briefing effort on the Defendants' motion for summary judgment relating to the application of Title 18 U.S.C. § 1030.

Defendants were represented in this litigation by at least four partners, plus associates and staff, from Fulbright and Jaworski LLP as well as two partners, plus associates and staff from Vinson & Elkins LLP. The Defendants also devoted lawyers and personnel from their in-house legal departments to assist with the defense of this litigation.

To accomplish the necessary work in the allotted time, Class Counsel assembled a core of eight principal counsel backed up by at least twice as many more attorneys from four different law firms. This team of lawyers was augmented by legal assistants, secretaries, clerks, translators, and other support personnel.

This Court now turns its attention to the twelve Johnson factors.

**1. The time and labor required.** As noted above the time committed by Class Counsel was enormous; but just as important the work performed was difficult. Class Counsel spent long hours weeding through technical material or reviewing data on a computer screen; they underwent the tedium of conducting depositions through translators; and they read piecemeal through discovery documents with the help of a translator. Although an upward adjustment of the customary fee might be justifiable in this case because of the intensity of the labor required to bring about the results Class Counsel achieved under this Court's expedited

49

schedule, this court will not grant an upward modification of either the Johnson factor multiplier or the applicable percentage in the hybrid fee analysis.

      **2. The novelty and difficulty of the issues.**  The second <u>Johnson</u> factor ("the novelty and difficulty of the questions involved") is particularly applicable to this case which has literally blazed a trail through the uncharted territory of allegedly defective computer microcode. This was far more than a breach of warranty case. Class Counsel pursued a cause of action that had never been asserted on behalf of a class: a claim for injunctive and monetary relief under Title 18 U.S.C. § 1030. Class Counsel successfully defended their theory against motions for summary judgment generating a flurry of briefing. In addition, Class Counsel pursued a revocation of acceptance theory on behalf of the class. The combination of these theories in a class action against a group of multi-billion dollar, multi-national defendants was completely novel. Indeed, Professors Arthur Miller, John Coffee, Geoffrey Miller, and Samuel Issachroff all agreed that this was a novel lawsuit–the first of its kind and the first significant class action settlement involving a high-tech company. Suffice it to say this was a case of first impression.

      **3. The skill required to perform the legal services properly.**  The third <u>Johnson</u> factor ("the skill required to perform the legal service properly") is also potentially applicable in this case. Class Counsel were pursuing a novel theory of liability on behalf of the owners of some five million (5,000,000) computers against multi-billion dollar corporations represented by very skilled counsel from two of the largest, if not the two largest, Texas-based law firms. The technical issues involved merit some enhancement. This Court also acknowledges the skill with which Class Counsel conceptualized the litigation and aggressively pursued it–particularly in terms of seeking an injunction against the continued manufacturing of

the allegedly defective laptops, seeking a warning under Title 18 U.S.C. § 1030, and conducting thorough discovery despite an aggressive defense.

      **4. The preclusion of other employment.** The fourth <u>Johnson</u> factor ("the preclusion of other employment by the attorney due to the acceptance of the case") merits some enhancement in this case. This Court–together with United States Magistrate Judge Wendell C. Radford–personally observed the day-to-day conduct of this litigation and decided the many discovery objections, pretrial motions, and other disagreements and issues that arose. Consequently, this Court is thoroughly familiar with the time limitations, the trial schedule imposed, the extraordinary commitment of time and labor the case required, and with the inability of Class Counsel to attend to other matters or to take on new business while this case was in active litigation.

      **5. The customary fee.** This factor either does not pertain to this case, does not suggest any modification to the lodestar or benchmark percentage, or is already accounted for in the lodestar or benchmark percentage.

      **6. Whether the fee is fixed or contingent.** This factor either does not pertain to this case, does not suggest any modification to the lodestar or benchmark percentage, or is already accounted for in the lodestar or benchmark percentage.

      **7. Time limitations imposed by the client or the circumstances.** This factor either does not pertain to this case, does not suggest any modification to the lodestar or benchmark percentage, or is already accounted for in the lodestar or benchmark percentage.

      **8. The amount involved and the results obtained.** The eighth <u>Johnson</u> factor ("the amount involved and the results obtained") warrants a substantial increase in the

51

benchmark percentage. As the United States Supreme Court has consistently maintained, as the

Fifth Circuit has repeatedly held, and as this Court has previously written, "'the most critical

factor in determining the reasonableness of a fee award is the degree of success obtained.' In an

action such as this one, '[w]here recovery of private damages is the purpose,…consideration to

the amount of damages awarded as compared to the amount sought' represents the primary

means to evaluate that concern." Dugas v. Jefferson County, Texas, 1996 WL 926153 *1 (E.D.

Tex. 1996) (quoting Farrar v. Hobby, 506 U.S. 103, 114 (1992), aff'd 127 F.3d 33 (5th Cir.1997);

see also Hensley v. Eckerhart, 461 U.S. 424, 436 (1983) (same); Migis v. Pearle Vision, Inc., 135

F.3d 1041, 1047 (5th Cir.1998); Johnson v. Eaton, 80 F.3d 148, 152 (5th Cir. 1996). According to

the experts, the proposed Settlement Agreement in this case is one of the best settlements ever

achieved in a class action alleging a defective product where only non-consequential economic

losses were at stake. When considering the quality of the proposed Settlement Agreement, this

Court considered both the monetary and the non-monetary benefits the class is to receive. See

Mills v. Electric Auto-Lite Co., 396 U.S. 375 (1970); In re Air Crash Disaster at Florida

Everglades on December 29, 1972, 549 F.2d 1006 (5th Cir. 1977), In re General Motors Corp.

Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768 (3d Cir. 1994), cert. denied,

516 U.S. 824 (1995).

     **9. The experience, ability, and reputation of the attorneys.** This factor either

does not pertain to this case, does not suggest any modification to the lodestar or benchmark

percentage, or is already accounted for in the lodestar or benchmark percentage.

10. **The undesirability of the case.**  This factor either does not pertain to this case, does not suggest any modification to the lodestar or benchmark percentage, or is already accounted for in the lodestar or benchmark percentage.

11. **The nature and length of the professional relationship with the client.** This factor either does not pertain to this case, does not suggest any modification to the lodestar or benchmark percentage, or is already accounted for in the lodestar or benchmark percentage.

12. **Awards in similar cases.**  This factor either does not pertain to this case, does not suggest any modification to the lodestar or benchmark percentage, or is already accounted for in the lodestar or benchmark percentage.

In common-fund class action litigation the most complex and difficult part of the lodestar/Johnson factor analysis is following the principle that "the lodestar may be adjusted according to a Johnson factor only if that factor is not already taken into account by the lodestar." Transamerican Natural Gas Corp. v. Zapata Partnership, Ltd. (In re Fender), 12 F.3d 480, 487 (5th Cir.1994).  Many of the Johnson factors may or may not be accounted for in the lodestar in the context of common-fund class litigation.  Moreover, in a case, as here, where a large group of counsel represented the class the complexity is compounded by the need to consider different hourly rates for attorneys of differing levels of experience.  Depending on how the hourly rate component of the lodestar is set, several of the factors leading to the overall multiplier may have to be adjusted to avoid giving counsel double credit for the same factor. This task is complex.

This Court has reviewed all the relevant evidence and finds that in this case the lodestar and Johnson factors multiplier can vary in inverse relationship to each other such that the product of the two creates a range of values.  This range of values identifies the fair, just, and reasonable

award of attorneys' fees in this case.  Specifically, this Court finds that the range of fair, just, and

reasonable attorneys' fees in this class action, based on the lodestar/Johnson factor analysis,

would be $140 million ($140,000,000.00) to $160 million ($160,000,000.00).

2. Boeing Percentage of the Common Fund Analysis

Under a percentage of the common fund analysis (the "percentage method"), based on the

opinions of other courts and the available studies of class action attorneys' fees awards (such as

the NERA study), this Court concludes that attorneys' fees in the range from twenty-five percent

(25%) to thirty-three and thirty-four one-hundreths percent (33.34%) have been routinely

awarded in class actions.  Empirical studies show that, regardless whether the percentage method

or the lodestar method is used, fee awards in class actions average around one-third of the

recovery.  The evidence concerning fee awards in mega-fund cases is more limited since there are

fewer such cases to study.  However, this court is aware that awards of fifteen percent (15%) of

the recovery or more are frequently awarded in these cases.  Several mega-fund settlements in the

Fifth Circuit and Texas have involved fees of fifteen percent (15%) or more.  See In re Shell Oil

Refinery, 155 F.R.D. 522 (E.D. La.1993) (eighteen percent (18%) of $170 million); In re

Combustion, 968 F.Supp. 1116 (W.D. La. 1997) (thirty-six percent (36%) percent of $127

million); In re Lease Oil Antitrust Litigation (No. II), 186 F.R.D. 403 (S.D. Tex. 1999) (twenty-

five percent (25%) of more than $190 million); Weatherford Roofing Co. v. Employers National

Insurance Co., No. 91-05637-F, 116th Judicial District (Dallas) (thirty percent (30%) of $140

million); see also In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465 (S.D.N.Y.

1998) (awarding fee of fourteen percent (14%) of $1 billion).  Given these guiding principles and

the size of the class settlement at issue in this case this Court concludes that fifteen percent

(15%) is the appropriate percentage for application of the percentage method in this case.

As to the value of the common fund in this case, this Court has heard opinions ranging from a low net present value of $800 million ($800,000,000.00) to a high net present value of more than $2.1 billion ($2,100,000,000.00). The median net present value has been set at $1.4 billion ($1,400,000,000.00). This Court is also aware that Toshiba has taken a loss of $1 billion ($1,000,000,000.00) in fiscal year 1999 based on the settlement of this case. Taking all these factors and evidence into consideration, this Court concludes that the value of the common fund in this case is conservatively estimated at $1 billion ($1,000,000,000.00) to $1.1 billion ($1,100,000,000.00).

Applying the Boeing percentage of fund method, this Court concludes that the fair, just, and reasonable amount of attorneys' fees would be calculated by multiplying the applicable percentage–fifteen percent (15%)–times the value of the common fund–$1 billion ($1,000,000,000.00) to $1.1 billion to ($1,100,000,000.00)–to yield a range of $150 million ($150,000,000.00) to $165 million ($165,000,000.00).

3. Hybrid Percentage Method Adjusted by Johnson Factors

In this approach, as noted above, courts begin with a base percentage of the common fund (here the Court will apply fifteen percent (15%)) and make an upward or downward departure based on an analysis of the relevant Johnson factors. The possible range of the common fund is very high–from $1 billion ($1,000,000,000.00) to $1.1 billion ($1,100,000,000.00). Under the hybrid percentage method, this Court concludes, given the size of the common fund, that only a slight upward modification, if any, would be warranted by the Johnson factors. Moreover, this Court recognizes that some uncertainty remains with respect to the precise value of the common

55

fund. Accordingly, under the circumstances of this case, this Court concludes that the hybrid percentage method would also yield a range of fair, just, and reasonable attorneys' fees of approximately one hundred fifty million dollars ($150,000,000.00) to one hundred sixty-five million dollars ($165,000,000.00).

In this case Class Counsel has made application for an award of attorneys' fees in the amount of $147.5 million ($147,500,000.00) and expenses of $3 million ($3,000,000.00). The total, $150.5 million ($150,500,000.00), is within the range suggested by all three possible methods of analysis: the lodestar/Johnson method, the percentage method, and the hybrid percentage method. Accordingly, this Court concludes that $147.5 million ($147,500,000.00) and up to $3 million ($3,000,000.00) in litigation expenses is fair, just, and reasonable under the circumstances and facts of this particular case.[16] Finally, under paragraph 10.1.1 of the proposed Settlement Agreement, this Court concludes that Class Representatives Ethan Shaw and Clive D. Moon are each entitled to recover the sum of twenty-five thousand dollars ($25,000.00) as compensation for acting as Class Representatives (which compensation totals fifty thousand dollars ($50,000.00) in the aggregate).

### 5. Objectors and Intervenors

Although objectors and intervenors were considerably scant for a case of this magnitude, some did nonetheless file objections and interventions with respect to this Court's consideration of the proposed Settlement Agreement. As so many of them pointed out, "[i]n order to protect

---

[16]This Court further concludes that Toshiba is obligated to reimburse Class Counsel for fees, expenses, and costs in responding, after the Notice Date, to questions from Putative Class Members and Settlement Class Members and in providing oversight of the claims administration process under paragraphs 10.2 and 13.1 of the proposed Settlement Agreement.

the rights of absent class members, the court must assume a more active role than it typically

plays in traditional litigation." Epstein v. MCA, 50 F.3d 644, 667 (9th Cir. 1995). [I]t is clear

that the court [should] not give rubber-stamp approval [to the proposed settlement] . . . To protect

the interests of class members, the court must independently and objectively analyze the

evidence." 3 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 11.41 at

11-88 (3d ed. 1992). Indeed, this Court took these admonitions seriously. It read, re-read, and

duly considered all objections regardless whether they were procedurally deficient, late-filed, or

simply inapposite to this case.[17]

###### *A.    Beneficial Objectors*

While some of the objections were obviously "canned" objections filed by professional

objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful

protests,[18] other objections contained considerable merit with respect to this particular case.

---

[17]For example, one inapposite objection included a motion for "preliminary declaratory judgment" to enjoin the following activity: "the Earth Gravity, from the U.S. Law Enforcement computer, through a Laser, from the U.S. Law Enforcement satellite, that the U.S. Law Enforcement use [sic] to take picture of and to watch [me] from the Earth Gravity from a U.S. Law Enforcement computer and things and peoples [sic] and others countrys [sic]." This Court considered and denied the motion in a separate, written order.

[18]Take, for example, the *Consolidated Objection, Memorandum and Motion for Limited and Expedited Discovery* [162] filed by the Thompson-Hutsler law firm on behalf of J.T. Karney, Southern Network Services, Inc. In a paragraph complaining about coupons, this objector argues: "[i]t is abundantly clear that *Sears* will enjoy increased floor traffic in its stores from those class members who actually use the coupon thereby benefitting *Sears* even further." *Id.* at ¶ 7.b (emphasis added). Well, "Sears" has nothing to do with this particular lawsuit. Moreover, there is no evidence–nor did this objector offer any evidence–that there are Toshiba "stores" that would enjoy "increased floor traffic" from class members using their coupons (or Toshiba Bucks). Frankly, there is nothing "abundantly clear" about this proposition as it relates to this case involving Toshiba–a manufacturer of the allegedly defective FDC's at issue in the proposed Settlement Agreement. This Court would venture to say this particular language has previously been filed in another class-action lawsuit involving "Sears." Perhaps that's where it should have stayed.

Specifically, several objectors suggested an extension of the coupon redemption date–an objection eventually accepted by and agreed to by the parties.

This Court has found that counsel for the objectors, by extending the coupon redemption period from one hundred eighty (180) days to one year has doubled the length of time available for class members to redeem their coupons and has thereby conferred a substantial benefit on the class. This Court concludes that under the facts of this case, a reasonable fee for the coordinated efforts of objectors' counsel in obtaining that benefit would be $6 million ($6,000,000.00). This fee should be paid to "Robert Cummins as Trustee for Objectors' Counsel" to be distributed among objectors' counsel in accordance with objectors' counsels' agreement.

This Court further concludes that the cash fund available to the class members should not be reduced by the award of attorneys' fees to the objectors' counsel and that the benefits to the class, both monetary and non-monetary, should not be reduced in any fashion. In keeping with this conclusion, the attorneys' fees awarded to objectors are to be paid by Class Counsel and Toshiba as they may agree, but without diminution in the value afforded to the class.

   B.    *Objector "Robert Demyanovich" Represented by Mr. Lawrence Schonburn*

While many objectors and intervenors had proper standing to present this Court with insightful objections relating to this particular class action settlement, some did not. Purported objector "Robert Demyanovich," allegedly represented by Mr. Lawrence Schonbrun, is one such objector. Mr. Schonbrun's main objection–on behalf of his purported client, "Robert Demyanovich"–went to the amount of attorneys' fees in this particular case. Indeed, Mr. Schonbrun's submitted curriculum vitae says, at the very beginning, that he "is nationally and internationally recognized as an authority on the issue of class action abuse, particularly in the

58

area of excessive attorneys' fee awards." *"Lawrence W. Schonbrun Class Action and Experience,"* attached as Exhibit B to the *"Declaration of Lawrence W. Schonbrun in Support of Objection to Proposed Settlement and Request for Award of Attorneys' Fees and Costs and Expenses"* [235]. Following this statement is six pages of media articles related to Mr. Schonbrun's class action activities, objections, and interventions–all apparently focused on the area of attorneys' fees in class actions.

So, this Court permitted Mr. Schonbrun, representing alleged objector "Robert Demyanovich," to present his objections and cross-examine all of the expert witnesses. Besides, as Mr. Schonbrun pointed out, this Court is the "guardian" of the class. Nevertheless, Class Counsel filed a response questioning Mr. Schonbrun's standing, which, in turn, raised serious questions about his submissions. After this Court permitted Mr. Schonbrun to present his objections and cross-examine the expert witnesses, this Court granted Mr. Schonbrun's oral motion for admission *pro hac vice* and questioned him about the serious discrepancies contained within his submissions to this Court.[19]

As Mr. Schonbrun noted, this Court is the "guardian" of the class. This Court agrees. However, it is also the guardian of the judicial system's integrity. An objector–even one of Mr. Schonbrun's purported expertise–cannot expect this Court to abandon one role for the other. Mr.

---

[19]Although this Court will not go into great detail about the discrepancies contained within Mr. Schonbrun's submissions, it will note the following about the information Mr. Schonburn submitted to this Court regarding his alleged client, "Robert P. Demyanovich": 1) the submitted address does not exist; 2) the submitted phone number is listed to someone other than "Robert P. Demyanovich"; 3) there is no "Robert P. Demyanovich" listed in San Francisco; 4) the original declaration of "Robert P. Demyanovich" (which originally had not been filed) had been altered; and 5) the serial number listed on "Robert P. Demyanovich's" declaration is different than the serial number listed on the submitted receipt of his Toshiba computer purchase.

Schonbrun submitted documents to this Court which are, at best, negligently created and, at worst, suspiciously manufactured. This Court ADMONISHES Mr. Lawrence Schonbrun for inappropriate litigation conduct designed to either bolster or manufacture standing through the manipulation of documents submitted to this Court. Further, this Court ORDERS that, should Mr. Lawrence Schonbrun desire to practice in the Eastern District of Texas again, he shall submit *one week before appearance* a written motion for admission *pro hac vice* along with a verified affidavit stating his client's name, current home address, and current daytime phone number. Finally, this Court VACATES its order entered on the open record (Tr. 267) granting Mr. Schonbrun *pro hac vice* status in this Court. That status is REVOKED.

### 6. Conclusion

Over one thousand years ago churches brought "defendant class actions" against insects and animals in a lame attempt to enjoin them from behaving like insects and animals–that is, to enjoin common activities of numerous "parties." Later, in medieval England and in response to the rigid compulsory joinder rule, the courts of equity developed the Bill of Peace to facilitate the adjudication of disputes involving common questions and multiple parties in a single action. Eventually, the United States adopted the English Bill of Peace as a model for its class action, eventually developing today's Federal Rule of Civil Procedure 23.

This Court finds the proposed class satisfies the requirements of today's Federal Rule of Civil Procedure 23. The proposed class contains hundreds of thousands–if not millions–of persons who collectively own five million (5,000,000) Toshiba laptop computers. Whether the alleged FDC defect constituted a violation of federal law, whether it constituted a breach of warranty, and the measure of concomitant, economic damages–all are questions of law or fact

common to the class. The alleged FDC defect is the same for all class members; the federal law question—Title 18 U.S.C. § 1030—is the same for all class members; and the available remedies for breach of warranty are essentially the same for all class members. Both Class Counsel and Class Representatives Shaw and Moon adequately prosecuted and represented the interests of class members. Additionally, the predominance and superiority of the class-action mechanism in this particular case further support certification of the class.

Accordingly, this Court CERTIFIES this proposed class.

Additionally, this Court finds the approximately $2.1 billion ($2,100,000,000.00) settlement is "fair, adequate, and reasonable." First, there was no fraud or collusion behind this settlement—the parties began, continued, and ended this lawsuit at arms-length. Second, this was a considerably complex and expensive case brought under a relatively new federal statute, Title 18 U.S.C. § 1030. Third, there has been considerable progression of this case on this Court's docket—progression beyond a heavily briefed motion for summary judgment as well as voluminous discovery. Fourth, there remain considerable hurdles for Plaintiffs to reach success on the merits should this case proceed to trial. Fifth, the settlement appears to provide for a complete eradication of the alleged FDC defect in all Toshiba computers—a rather complete recovery for the class members. Finally, the settlement is supported by the opinions of Class Counsel, the opinions of Class Representatives, and the conspicuous absence of substantial objections.

Accordingly, this Court FINDS the approximately $2.1 billion ($2,100,000,000.00) Settlement Agreement is "fair, adequate, and reasonable."

Finally, this Court finds the $147.5 million ($147,500,000.00) in attorneys' fees as "fair, just, and reasonable." Although the percentage method endorsed by the United States Supreme Court and the majority of circuit courts is superior to the lodestar method, it remains unclear whether the Fifth Circuit–were it called upon to review this decision–would employ the lodestar method, the percentage method, or the hybrid method used by many district courts in the Fifth Circuit and the Eleventh Circuit. Out of an abundance of caution this Court performed an analysis under all three methods and found that $147.5 million ($147,500,000.00) in attorneys' fees is fair, just, and reasonable.

Accordingly, this Court FINDS the $147.5 million ($147,500,000.00) in attorneys' fees as "fair, just, and reasonable."

So, having conducted the Fairness Hearing and considered the pleadings, evidence, objections, and all other submissions, this Court CERTIFIES the proposed class; it FINDS the approximately $2.1 billion ($2,100,000,000.00) Settlement Agreement is "fair, adequate, and reasonable"; and it FINDS the $147.5 million ($147,500,000.00) in attorneys' fees is "fair, just, and reasonable."

The Settlement Agreement is FORMALLY APPROVED.[20]

It is SO ORDERED.

Signed this 28th day of January, 2000.

Thad Heartfield
United States District Judge

---

[20]This Court adopts by reference in its conclusions of law all other conclusions of law expressed in its associated orders, including, but not limited to, its Order of Final Approval and Final Judgment, as if those conclusions were included in this opinion.

### 7. Findings of Fact

1.    The notices required by this Court's Order Approving Notice to the Settlement Class
      provided all class members notice of the Fairness Hearing. (Ex. 33-34)

2.    The notices were clear and comparable to those given in other class actions. (Ex. 35)

3.    This Court reviewed and considered all objections filed of record.

4.    All objectors were afforded the opportunity to present their objections to the court at the
      Fairness Hearing.

5.    At the Fairness Hearing Robert P. Cummins sought leave to represent as coordinating
      counsel all objectors. This Court granted his motion. (Tr. 44)

6.    Mr. Cummins, as a result of modifications to the proposed settlement agreement, moved
      to withdraw the objections, motions to intervene, and other pending motions of all the
      objectors and intervenors at the Fairness Hearing, except Robert Demyanovich. This
      Court granted his motion. (Tr. 45)

7.    This Court permitted Objector Robert Demyanovich, through his counsel Lawrence
      Schonbrun, to present his objections to the proposed Settlement Agreement at the
      Fairness Hearing, which objections were overruled. (Tr. 266) Subsequently Mr.
      Demyanovich, by means of consent and stipulation by his counsel, consented to the order
      overruling his objections.

8.    United States Attorney Michael Bradford appeared before this Court to announce that the
      Federal Government of the United States of America was a member of the Settlement
      Class that had opted out of the proposed class settlement pursuant to the opt out
      provisions of the proposed Settlement Agreement but had elected to opt back into the
      class. On behalf of the Federal Government of the United States of America, Mr.
      Bradford said:

      It's our belief that the settlement is fair, that [the proposed Settlement Agreement]
      should be approved by the court and it's in the best interest of the United States to
      participate in the class settlement. And I have discussed this matter with Mr.
      Ogden, David Ogden, the head of the Civil Division for the Department of Justice.
      He is in agreement and aware of the statement being presented to the court. In
      evaluating this matter, we've examined potential litigation the government could
      bring on its own and concluded that the benefits we would receive from the
      settlement are very favorable to the Federal Government, evaluating such factors
      as cost of litigation, risk of litigation, the normal factors that would go into
      assessing any settlement, and it is our opinion that the class settlement provides a

fair and reasonable recovery for the United States. And in reviewing the class settlement in general terms, it appears to the Government that this case is very appropriate for a class settlement, which we understand is one of the issues before the court in a fairness hearing, is whether or not it is appropriate to settle as a class settlement. We believe that this is a classic case that is appropriate for this type of approach with a very large number of white [sic] claims that can be adjudicated in a single action, which is probably the only way that the great majority of class members could realistically have access to the system. Even for a class member as large at the United States Government, the costs and difficulties of litigation are substantial, which make this settlement appealing for individuals. Independent owners accessing the courts would likely be impossible. (Tr. 38-40)

9.    Mr. Bradford also said it was the view of the United States that the proposed Settlement Agreement met all the requirements of a class action, provided substantial benefits to the United States and other class members, and should be "upheld and found to be a fair settlement." (Tr. 42)

10.   The Toshiba floppy diskette controller ("FDC") contains microcode. Toshiba's specifications for its FDC provide that it should "raise a flag" or report to the operating system when an overrun or underrun occurs during a read or write operation to or from the floppy diskette drive. However, Toshiba FDCs manufactured for sale in the U.S. prior to November 8, 1999, do not "raise a flag" or report when an overrun or underrun occurs only on the last byte of a sector during a read or write operation to and from the floppy disk drive. (Ex. 6)

11.   The microcode in the Toshiba FDC was originally written by NEC of Japan. By 1987 NEC had discovered the alleged FDC condition and stated publicly to all FDC component purchasers that the FDC condition could result in undetected data loss, data corruption, and system failure. (Ex. 7)

12.   NEC described the FDC condition as a "killer bug" in its "MULTITASKING MURDER MYSTERY" advertising campaign. (Ex. 7)

13.   If an overrun or underrun occurs only on the last byte of a sector during a write operation to the floppy diskette drive, the result would be either loss of data, or writing the wrong data to the diskette (corruption of data). Overruns and underruns can occur in multi-tasking environments because of competition for resources within the computer. (Ex. 6)

14.   If there is a loss of data or a writing of the wrong data as described in the above paragraph, the user may or may not know that there has been a loss of data, or a writing of the wrong data. (Ex. 6)

15.   Should the user discover that there has been data loss, or a writing of the wrong data, he or she is unlikely to determine or suspect that it was caused by the FDC condition. (Ex. 6)

16.   Each year, Toshiba receives many inquiries relating to floppy diskette drives. However, Toshiba attributed none of these problems to the FDC condition. (Ex. 6)

17.   Toshiba contended throughout this litigation that its quality assurance, testing, support, help, repair, and service materials and databases did not indicate that the Toshiba FDC manifests the FDC condition. (Ex. 6)

18.   Toshiba's quality assurance, testing, support, help, repair, and service materials and databases do not indicate that the FDC condition could be a cause of data loss, data corruption, the writing of the wrong data, or system failure. (Ex. 6)

19.   Toshiba never alerted or warned its customers or the public that the Toshiba FDC could cause undetected data loss, data corruption, writing of the wrong data, or system failure as a result of the FDC condition. (Ex. 6)

20.   The pervasive use of computers in our society makes the preservation of data on computers critical for business, government, medical, engineering, and personal users. (Ex. 17, Tr. 156-59)

21.   The FDC condition can cause irrevocable loss of data if it manifests itself. (Ex. 16)

22.   Plaintiffs alleged that the FDC condition is a severe and dangerous defect. (Ex. 17)

23.   Plaintiffs alleged that the loss of data resulting from the FDC condition results in loss of time to Toshiba computer users, which loss of time includes searching for lost files, attempting repair and recovery of lost files, and recreating, if possible, the lost files. (Ex. 17)

24.   Plaintiffs alleged that the loss of time, and the concurrent loss of productivity, resulting from the FDC condition is a serious problem for business and industry. (Ex. 17)

25.   Plaintiffs alleged that in some instances, particularly in cases in which computers with the FDC condition are used for medical, engineering or public safety applications, loss of data due to the FDC condition could cause property damage or personal injury, including death. (Ex. 7)

26.   The Settlement Class at issue is defined and composed of all persons, businesses, governments, and other legal entities, other than the Settling Defendants, who are United States citizens or residents and who own or lease a Toshiba notebook or laptop computer of any model, except Librettos. However, the Settlement Class does not include those

persons or entities that purchased or leased a Toshiba notebook or laptop computer after November 8, 1999, if that computer has a serial number ending in the letter "U." (Ex. 1 & 6)

27. All models of Toshiba Laptop Computers incorporate a Toshiba FDC with the FDC condition, except: [A] Librettos (which do not contain internal floppy disk drives); and [B] models purchased after November 8, 1999, that have a serial number that ends in a "U." (Ex. 6)

28. With respect to leased Toshiba Laptop Computers, the Settlement Class Member who is entitled to the remedies and benefits afforded by this Settlement Agreement shall be determined by the lease agreement between the lessor and lessee, to be established by a certification of ownership on the Claim Form; in the event of a dispute between the lessor and lessee, the dispute will be decided by the Claims Administrator and this Court as provided in the proposed Settlement Agreement. (Ex. 1)

29. The proposed Settlement Class as defined in the proposed Settlement Agreement consists of the owners of about five million (5,000,000) computer units, about three million (3,000,000) of which are under a Toshiba manufacturer's warranty. (Ex. 6)

30. Whether a person is a member of the class can be easily determined from the serial number of his or her computer. (Ex. 6)

31. In order to be entitled to the warranty remedies it is not required that the computer or warranty be registered. The serial number on each Toshiba Laptop Computer contains a unique code that allows TAIS to identify its status under the TAIS standard warranty. Without regard to this lawsuit, TAIS honors warranties for unregistered computers without proof of purchase based on these serial number codes that show the length of the standard warranty and the date that the unit was manufactured. The serial number will contain a "-1" to the right of the serial number if the Toshiba Laptop Computer had a standard one-year manufacturer's warranty, or a "-3" if it had a standard three-year manufacturer's warranty. Toshiba Laptop Computers manufactured in 1998 and 1999 start with the identifier of the month (1, 2, 3, 4, 5, 6, 7, 8, 9, X, Y, Z) as the first digit, and then contain the last number of the year (8 for 1998, and 9 for 1999) as the second digit.  For warranty purposes, absent proof of purchase or registration, TAIS assumes that a Unit was purchased in the month after the month it was manufactured. One can establish that a particular Toshiba Laptop Computer was purchased on or after March 5, 1998, either by submitting proof of purchase that shows this, or if the first two digits in the Unit's serial number are: 28, 38, 48, 58, 68, 78, 88, 98, X8, Y8, Z8, 19, 29, 39, 49, 59, 69, 79, 89, 99, X9, Y9, or Z9.  (Ex. 6)

32. The proposed Settlement Agreement does not preclude a class member from pursuing a claim for consequential damages except for damages to the physical, floppy diskette

itself. (Ex. 1)

33.   The proposed Settlement Agreement afforded those individuals who did not wish to be
      included in the class the opportunity to opt out. (Ex. 1)

34.   The proposed Settlement Agreement is the negotiated product of intense Court-ordered
      mediation, mediated by retired judge Thomas A. Thomas. (Ex. 6)

35.   The Court ordered the mediation and selected the mediator on its own initiative, not at the
      request of the parties.  They were preparing diligently for a hearing on the class' request
      for injunctive relief, set for November 29, 1999, at which important factual and legal
      issues regarding the allegedly defective FDC would have been tried.

36.   This Court takes judicial notice of the fact that discovery and other preparations for the
      hearing continued while the mediation, which lasted for weeks, was in progress.  This
      Court also knows that the mediation was conducted at arm's length between parties who
      were strongly opposed and represented by fully competent lawyers.
      Toshiba has consistently and emphatically denied that its laptop computers are defective,
      that any user ever suffered data loss as a result of the FDC, and that the Plaintiffs are
      entitled to any relief whatsoever under federal or state law.  Toshiba had previously
      moved for summary judgment on the Plaintiffs' federal-law claim.  After full briefing and
      argument, this Court denied Toshiba's motion on August 26, 1999. *See August 26, 1999
      Order Denying Motions for Partial Summary Judgment* [99].

37.   This Court is convinced that had the parties not agreed to a settlement, the hearing on the
      class' request for injunctive relief would have occurred as scheduled.  Although an
      enormous volume of discovery changed hands and depositions were unusually laborious
      because of the need for translators and the frequency of language-related disagreements,
      lawyers on both sides worked diligently to see that this Court's schedule was met.  Due to
      the serious nature of the Plaintiffs' allegations, this Court ordered that the hearing on the
      injunction occur as early as possible and set the hearing for the earliest date the parties
      could conceivably meet.  If the computers were defective, as the class alleged, users faced
      (on a daily basis) a potential risk of data loss or system failure, the consequences of which
      could be serious and dangerous.  This Court wanted to get to the bottom of the matter as
      quickly as possible to ensure that appropriate steps were quickly taken to protect users
      from harm, should the defect and alleged consequences have been proved.

38.   With respect to Toshiba laptop computer owners the proposed Settlement Agreement
      provides the following remedies:  (1) All persons who own or lease a qualifying Toshiba
      laptop computer that was purchased new on or after March 5, 1998, are entitled to a cash
      payment which varies based upon when the computer was purchased. (2) All persons who
      own or lease a qualifying Toshiba laptop computer that was under warranty as of or after
      March 5, 1999, are entitled to a software solution to the FDC condition, and a coupon for

67

two hundred twenty-five dollars ($225.00) good for the purchase of other Toshiba computer products. If these class members are dissatisfied with the software patch, they are entitled to a hardware solution (either a new FDC or a coupon for an external floppy diskette drive) and a two hundred dollar ($200.00) coupon (to receive the two hundred dollar ($200.00) coupon and the hardware fix or external floppy drive under this option, they must return the two hundred twenty-five dollar ($225.00) coupon or pay the twenty-five dollar ($25.00) difference in cash). (3) All class members who do not qualify for either of the two previous remedies are entitled to relief in the form of a software patch for the FDC condition and a one hundred dollar ($100.00) coupon. Class members qualifying for the remedy under subpart (2) may also be entitled to the remedy under subpart (1). (Ex. 1)

39.   The proposed Settlement Agreement requires Toshiba to manufacture all future laptop and notebook computers without the FDC condition, thus resulting in the total elimination of the FDC condition in future computers. Since brand loyalty is common among computer users, this benefits many class members who are repeat purchasers of Toshiba laptops,. (Ex. 1)

40.   The proposed Settlement Agreement requires Toshiba to create and make available for free a software patch ("Software Patch") to address the FDC condition by correctly performing its function on existing computers. It further requires Toshiba to make the patch available on a continuing basis. (Ex. 1)

41.   The proposed Settlement Agreement requires Toshiba to provide to qualifying class members a hardware fix ("Hardware Fix") for the FDC condition or an external floppy diskette drive that does not contain the FDC condition if the qualifying members are not satisfied with the Software Patch. (Ex. 1)

42.   The proposed Settlement Agreement requires Toshiba to establish a cash fund in the amount of $597.5 million for payment of the claims of the class members. (Ex. 1)

43.   If the cash fund is not exhausted by claims from class members, the remaining funds will be distributed to a charity which will use the funds to purchase Toshiba laptop and desktop computers and distribute them in the United States to schools, churches, non-profit organizations, libraries, hospitals, and the poor. No portion will revert to Toshiba. (Ex. 1)

44.   In the proposed Settlement Agreement Toshiba agrees to pay attorneys' fees of one $147.5 million ($147,500,000.00). This payment is independent of the cash payment to the class. (Ex. 1)

45.   The proposed Settlement Agreement requires Toshiba to pay Class Counsel's expenses up to the sum of $3 million ($3,000,000.00) without objection. (Ex. 1)

68

46.     Toshiba shall pay the cost of all class notices and settlement administration provided for in the Settlement Agreement. (Ex. 1)

47.     As required by the proposed Settlement Agreement, Toshiba created the Software Patch which will alert the operating system of a Toshiba laptop computer if an overrun on the last byte of a sector caused data to be written incorrectly to a floppy diskette address. This patch prevents the FDC condition from occurring without notice to the user. Toshiba has tested the Software Patch and confirmed that the patch performs with no overall diminution of performance on Toshiba laptop computes. Toshiba further agrees to investigate and attempt to resolve problems that might arise in the use of the patch and to update the patch as appropriate. (Ex. 21)

48.     As required by the proposed Settlement Agreement, Toshiba created the Hardware Fix which will alert the operating system of a Toshiba laptop computer if an overrun on the last byte of a sector caused data to be written incorrectly to a floppy diskette address. The Hardware Fix is a modification of the Toshiba chips that contain an FDC. All Toshiba laptop computers manufactured for sale in the United States from and after November 8, 1999, incorporate FDC's that comply with the definition of "Hardware Fix" in the proposed Settlement Agreement. Toshiba has tested the Hardware Fix and confirmed that the fix performs with no overall diminution of performance on Toshiba laptop computers. (Ex. 23)

49.     The Software Patch is valued at twenty-nine dollars ($29.00) per unit. (Ex. 22)

50.     The Hardware Fix is valued at twenty-nine dollars ($29.00) per unit. (Ex. 24)

51.     The value of the PCMCIA FDC being provided by Toshiba America Information Systems, Inc. ("TAIS") as an alternative to the Software Patch is one hundred twenty-dollars ($120.00) per unit. (Ex. 24)

52.     The only practical and feasible method of installing the Hardware Fix in the laptop and notebook computers of those class members seeking that remedy option is the procedure provided for in the proposed Settlement Agreement. (Ex. 25)

53.     Toshiba established the Internet website and Internet links as required by the proposed Settlement Agreement. (Ex. 26)

54.     Toshiba provided the names and addresses of registered warranty owners as required by the proposed Settlement Agreement. (Ex. 26)

55.     The charitable organization required by the proposed Settlement Agreement has been established and chartered under the laws of the State of Texas. (Ex. 28)

56.  TAIS and Toshiba intended to and did provide an express warranty with the computers that are the subject of this lawsuit. (Ex. 1)

57.  The Toshiba standard one or three year warranty (as may be extended by the purchaser) provides that TAIS will repair or replace defective parts during the warranty period and warrants that Toshiba Laptop Computers are free from defects in materials or workmanship under normal use for the warranty period. This warranty is substantively the same for all Toshiba Laptop Computers purchased from TAIS that were under warranty as of and from and after March 5, 1999. (Ex. 6)

58.  Plaintiff Shaw's and Plaintiff Moon's express warranties are substantively the same as all other settlement class members except as to length. (Ex. 6)

59.  Any owner of a Toshiba Laptop Computer who has a manufacturer's warranty beyond that shown by the serial number on their Unit will be registered with TAIS. (Ex. 6)

60.  Uniform Commercial Code § 2-313 regarding express warranties was enacted without variation in forty-nine states and the District of Columbia except for minor variations in Louisiana, Maine, Minnesota, Michigan, and South Carolina. These minor variations do not affect the warranty claims at issue in this case. Although Louisiana did not adopt § 2-313, its state law establishes the same warranty principles as § 2-313. (Ex. 14)

61.  Uniform Commercial Code § 2-719 was enacted without variation in forty-nine states and the District of Columbia, except for Alabama, California, Mississippi, Vermont, and Washington. These variations do not affect the warranty claims at issue in this case. Although Louisiana did not adopt § 2-719, its state law establishes the same warranty principles as § 2-719 (Ex. 14)

62.  This is one of the largest consumer class recoveries stemming from an allegedly defective product--possibly the largest ever in a case where only economic damages were at issue. (Ex. 10, 11, 12, & 13)

63.  But for this lawsuit, Toshiba would not have developed or made available either the Software Patch or Hardware Fix for at least the immediately foreseeable future. Toshiba projects that, but for this lawsuit, it would have manufactured and sold an additional one million seven-hundred fifty thousand (1,750,000) laptop and notebook computer units after November 8, 1999, without either the Software Patch or the Hardware Fix being available or incorporated into the new units. (Ex. 6)

64.  The repair of the FDC condition by means of the Hardware Fix is a benefit to the class members.

65.    The elimination of the FDC condition from future Toshiba laptop and notebook
       computers is a benefit to all computer consumers.

66.    The coupons involved in this settlement are beneficial to the class for several reasons.
       Many class members, having already purchased a Toshiba computer product, will have
       need for accessories or peripherals designed to be used with that product. Or, they will
       have developed a brand loyalty to Toshiba. Both situations would give class members
       reason to purchase goods from Toshiba in the future. The coupons are good for the
       purchase of any Toshiba computer product. They are not limited to specific products
       which may or may not be of use to an individual class member. The coupons may be
       redeemed at participating retailers and resellers; Toshiba has provided sufficient
       participating retailers and resellers, including a mail-order facility, sufficient to handle the
       volume of anticipated redemptions. The coupons are freely transferable without
       limitation and can be used at par value by any holder. Moreover they can be aggregated,
       all of which means that the coupons, except for their limitation to being applied to
       Toshiba computer products, are virtually the same as cash. The fact that the coupons are
       freely transferable increases the probability that a secondary market will develop and
       gives class members the opportunity to sell their coupons or acquire other coupons if they
       so desire. The potential secondary market, when combined with the fact that the value of
       the coupons can be aggregated, gives the individual the possibility of obtaining a
       sufficient number of coupons to purchase higher-priced Toshiba products or to benefit
       from receiving multiple coupons because the class member owned more than one
       computer. The coupons can be redeemed immediately after issue, but will remain valid
       for one year. This increases the value to the class member and affords him or her more
       options with respect to when and how the coupon will be redeemed. Finally, the coupons
       can be used for full-priced, discounted, and sale items. This means that the class member
       has the unilateral power to reduce even further the purchase price of a Toshiba product he
       or she finds on sale or available at a discount price. (Ex. 3 & 11)

67.    The proposed Settlement Agreement originally provided that the coupons would be valid
       for six months. (Ex. 1) However, this term was modified and extended to one year (Ex.
       3). This modification was due, in part, to the efforts of certain objectors' counsel. This
       court finds the extension of the term of the coupons was a substantial benefit to the class
       and justifies an award of attorneys' fees to certain objectors' counsel.

68.    Like currency, the Toshiba coupons can be aggregated. Like currency, they are
       transferable. The key difference between these coupons ("Toshiba Bucks") and cash is
       that they may be spent only on Toshiba products. (Ex. 11)

69.    The settlement benefits not only members of the class, but also all future purchasers of
       Toshiba products and all persons who rely on the integrity of data that might have been
       damaged by the FDC condition in Toshiba computers. (Ex. 17)

70.    The claims of most class members are "negative value" claims; that is, they are claims in which the cost of enforcement in an individual action would exceed the expected individual recovery. (Ex. 10, 11, 12, & 13)

71.    The class also contains a number of businesses that individually own large numbers of Toshiba laptops. Some own thousands or tens of thousands of units. These companies support the settlement. Several have already filed enormous claims. Others have contacted the parties and told them that they will file such claims in the future. The only problem these businesses had with the settlement concerned the method of proving ownership. The original method required claimants to photocopy the bottoms of their computers due to Toshiba's reasonable desire to avoid paying on duplicate or fraudulent claims. This was burdensome for companies with thousands of laptops that, at any moment, might be in use around the globe. This problem has been dealt with to the claimants' satisfaction and to Toshiba's satisfaction by a minor amendment to the proposed Settlement Agreement. As a result of this amendment the two objectors that voiced this "burdensomeness" concern withdrew their objections. (Ex. 2, Tr. 14 & 45, Objections of MLC Group and Novartis Pharmaceutical Corporation)

72.    In the United States there is an imbalance of knowledge with respect to computers and computer-related technologies which runs along socio-economic lines. Children growing up in homes without computers or attending schools without computers and computer training are substantially disadvantaged with respect to education and future employment. This imbalance, referred to as the "digital divide," has received nationwide attention and study. The goal of eradicating it is an important public priority.  Although this Court believes and expects that class members will receive most of the guaranteed cash fund that this settlement will create, the Court also believes and finds that the charity to be funded by the unclaimed residual will help to overcome this problem. By doing so, the charity will benefit many members of the class, particularly the enormous number of businesses, large and small, whose employees use computers. These businesses need access to a labor market rich in persons with developed computer skills. Currently, there is a significant shortage of such persons. Companies in the information technology industry have even asked the federal government to soften barriers to immigration so that more can be found. By helping Americans on the wrong side of the "digital divide" become adept at using computers, the charity will benefit a significant portion of the class while also helping the poor. (Amicus Brief of Advocates for Persons in Poverty)

73.    In this Court's judgment, it is difficult to think of a better way of using any funds that may remain after all claims are processed. In many class actions, unclaimed funds revert to defendants or are used to pay additional attorneys' fees. The parties could have agreed to either of these arrangements. The Fifth Circuit has specifically approved these options, and this Court would have had discretion to approve them. However, neither alternative would have been good for the class. A reversion to Toshiba would not have helped the class at all. To the contrary, it could have harmed the class by giving Toshiba an

72

incentive to minimize the rate at which its customers filed claims. As it is, Toshiba now has every reason to see that its customers do file claims. Nor would a reversion have required Toshiba to bear what the settlement negotiations determined to be the reasonable cost of the alleged defect. Finally, a reversion would have created an appearance of impropriety by suggesting that Class Counsel and Toshiba may have conspired to make the recovery seem larger than it really was to justify an inflated award of attorneys' fees. Payment of unclaimed funds to class counsel also would not have helped the class. It would have reduced class counsel's incentive to encourage class members to file claims and to design a claims process that is easy to use. For this reason, it too would have created an appearance of impropriety that this Court would have had to investigate. At the same time, payment of unclaimed funds to settlement class members who claimed the cash remedy would have resulted in an unjustifiable windfall to those class members, potentially allowing them to recover in excess of the purchase price or current value of their computers.

74. This Court applauds and congratulates Class Counsel and Toshiba for dedicating any unclaimed funds that remain at the end of the case to an important and worthwhile social purpose that has the potential to benefit a large segment of the class.

75. Consumers have an interest in seeing that their computers and software operate in such a manner as to not lose or destroy the information which they are attempting to preserve. (Ex. 17, Amicus Brief of Consumer Groups)

76. Because of the amounts of money involved and the cost of litigation, individual lawsuits do not provide the individual consumer with an economically feasible means of seeking a remedy to the alleged defect at issue in this class action. (Amicus Brief of Consumer Groups)

77. The aggregation of claims possible in a class action helps to even the playing field for the consumer. (Amicus Brief of Consumer Groups)

78. The proposed Settlement Agreement is structured so that Toshiba has every incentive to encourage class participation in the settlement and claims procedure, particularly since any amounts not paid to the class do not revert to Toshiba but are instead donated to charity.

79. The results obtained by Class Counsel in this litigation will in all likelihood result in the more careful design and manufacturing of computer products, not only by the particular Defendants in this case, but by other manufacturers in the computer industry as well.

80. The result achieved for the class in this litigation far exceeds the recovery secured by way of settlement in almost all class actions. (Ex. 10, 11, 12 & 13)

73

81.    The proposed Settlement Agreement provides substantial benefits to the Settlement Class and is just, fair, reasonable and adequate to the members of the Settlement Class, in light of the relevant facts and the applicable law. Toshiba agrees that the evidence supports an aggregate face value of the settlement to all owners of Toshiba Laptop Computer Units of over $2.1 billion ($2,100,000,000.00). The Settlement Agreement also benefits Toshiba in light of the relevant facts and the applicable law. (Ex. 6)

82.    Based on submitted, confidential economic information, this Court finds that the amount of the settlement is reasonable in light of the combined total United States assets of all Toshiba subsidiaries. (Exs. 30-32)

83.    Depending on the parameters used, the proposed Settlement Agreement ranges in value from eight hundred twenty million dollars ($820,000,000.00) to $2.125 billion dollars ($2,125,000,000.00). (Ex. 46) This Court finds that it does not need to determine an exact value of the proposed settlement, but concludes that a reasonable median evaluation is $1.4 billion ($1,400,000,000.00).

84.    The named Plaintiffs' interests are the same as the Settlement Class Members' and any differences do not create conflicts between the named Plaintiffs' interests and the interests of the class members. (Ex. 6)

85.    The named Plaintiffs are competent, well-informed, and were and are actively involved in the prosecution of this case.

86.    Class Counsel are experienced and competent and have no conflicts of interest.

87.    The issues involved in this case are technical and the discovery resources necessary to prosecute and defend this type of case are substantial. Toshiba desires to avoid possible inconsistent results from individual litigation. Therefore, it is highly desirable to concentrate the litigation of the claims in this particular forum. (Ex. 6)

88.    The Settlement Agreement was reached through extensive, arms-length negotiations between the parties during weeks of long, court-ordered mediation. The substantive terms of the settlement were agreed to prior to negotiations or agreement regarding Class Counsel's attorneys' fees. (Ex. 6)

89.    As a result of this lawsuit and settlement, Toshiba Corporation declared an extraordinary loss of approximately $1 billion ($1,000,000,000.00) against its financial statements for fiscal year 1999. (Ex. 6)

90.    Since there are no consequential damages at issue in this case, there is very little variance in the legal or factual nature of the claims of the class members. The alleged FDC condition is present in each class member's computer.

91.     Each class member has a present, fully-developed economic injury under the alleged
        theories of liability. There are no "futures" claimants nor any latency period that must run
        until the injuries are fully revealed. No other settlement, case, or proceeding is tied to,
        linked with, or otherwise hinges on this settlement.

92.     The dominating common issues are the application of the express warranty made to all
        class members, the alleged, hidden defect in Toshiba's FDC's, and federal law governing
        actions that result in data corruption or destruction. This Court knows of no individual
        issues that would make this case difficult to manage as a class action.

93.     If we look at all of the computers owned by the members of the class who have opted out
        of the proposed settlement, they constitute less than 1% of the total number of computers
        sold with the FDC condition.

94.     The question of whether TAIS' and Toshiba's warranties failed of their essential purpose
        in this case was disputed by TAIS and Toshiba.

95.     Due to the time-sensitive nature of the Plaintiffs' defect allegations and request for
        injunctive relief, this Court placed this matter on an accelerated discovery docket.

96.     Class Counsel had to sort through millions of pages of documents--many of which were in
        Japanese and had to be translated. In addition to these documents, Defendants also
        produced a mountain of magnetic and optical media containing millions of entries
        relating to product design, defects, complaints, and other relevant issues. Deciphering the
        relevant information and data from the digital backup tapes, optical disks, removable
        magnetic disks, floppy disks, and videotapes required substantial skill and was itself a
        monumental task. (Ex. 7)

97.     To maintain the discovery schedule class counsel were frequently taking depositions
        simultaneously and had to bring sufficient legal resources to bear to accomplish this.
        Toshiba provided an aggressive defense to Plaintiffs' claims and discovery efforts.

98.     Due to language and cultural differences, the normal progress of discovery and the taking
        of depositions was prolonged and more difficult. The court ordered the parties to
        participate in mediation. *See August 20, 1999 Mediation Order* [87]; *August 24, 1999
        Additional Mediation Order* [93]. This mediation did not stay discovery but was
        conducted concurrently with discovery. The mediation process lasted from September
        24, 1999, until the proposed settlement was reached on October 27, 1999. (Ex. 7)

99.     Named Plaintiffs Ethan Shaw and Clive D. Moon participated in and monitored the
        progress of this case. Their activities included preparing for and giving depositions,
        attending hearings, consulting with class counsel with respect to the case, keeping up with

75

the progress of the case, reviewing the settlement evidence, attending depositions of Toshiba witnesses in California, attending portions of the mediation process, and making their Toshiba computers available as evidence. (Ex. 8 & 9)

100. The alleged FDC condition was documented through experiments and demonstrations performed by Udo W. Pooch, a professor at Texas A & M University who is an expert in computer operations and information systems. Professor Pooch has both taught and written in this area for over thirty (30) years. (Ex. 16)

101. TAIS has put in place a project team to evaluate, select, and monitor a Claims Administrator, and to implement the settlement. (Ex. 38)

102. TAIS has provided special instructions and training to certain employees who are available through the "In-Touch Call Center" to answer customers' questions regarding the technical issues involved in the settlement, including the software patch and the Hardware Fix. (Ex. 38)

103. Key sales staff have been trained to address such inquiries and to be available to their customer contacts. Magdalene Merante, Director of Customer Satisfaction of the Computer Systems Group for TAIS, will be available to handle special problems or requests from class members. (Ex. 38)

104. Toshiba recommends and vigorously supports approval of the proposed Settlement Agreement. Toshiba stipulates to the values, statements, and other agreements stated in the proposed Settlement Agreement. (Ex. 6)

105. Class counsel sought and submitted opinions from five leading experts on class action law: Professors John C. Coffee, Jr. (Columbia), Samuel Issacharoff (Columbia, formerly at The University of Texas), Arthur Miller (Harvard), Geoffrey Miller (New York University), and Jack Ratliff (The University of Texas). These men number among the country's leading scholars. Their works have been cited repeatedly by federal and state courts, including the United States Supreme Court. While they have not always agreed in the past and on occasion have appeared opposite each other as experts in class action litigation, in this case they are unanimous that this class should be certified, that the settlement is reasonable and of value to the class members, and that the bargained-for attorneys' fees, which Toshiba had every incentive to minimize, are reasonable. (Ex. 10, 11, 12, & 13)

106. The most complete analysis of fee awards in class actions conducted to-date was conducted by the National Economic Research Associates, an economics consulting firm. That data is reported at Frederick C. Dunbar, Todd S. Foster, Vinita M. Juneja, Denise N. Martin, Recent Trends III: What Explains Settlements in Shareholder Class Actions? (NERA, June, 1995) (hereinafter "NERA Study"). This data indicates that regardless of

size, attorneys' fees average approximately 32% of the settlement. (NERA Study at 7). (Ex. 12)

107.    If one considers the attorneys' fees in relation to the total cash payments made by Toshiba (i.e., the $597.5 million settlement and the $147.5 million fee award) the attorneys' fees constitute 19.8% of the value of the settlement. If one considers the entire $2.1 billion settlement value, the attorneys' fees constitute a mere 7.02% of the recovery. Any other valuation of the settlement creates an attorneys' fees percentage somewhere between these two calculations. (Ex. 10, 11, 12 & 13)

108.    All such calculations result in an attorneys' fees percentage in this case substantially below the prevailing percentages identified in the NERA Study. (Ex. 12)

109.    The attorneys' fees information found in the NERA Study is consistent with information found in other studies. *See*, Stuart Logan & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Securities and Antitrust Class Actions*, 13 CLASS ACTION REP. 249, 250 (1990); Vincent E. O'Brien, *A Study of Class Action Securities Fraud Cases*, 1988-1996 (the "O'Brien Study"); Thomas E. Willging, Laurel L. Hooper, and Robert J. Niemic, *An Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules (1996)* (the "Federal Judicial Center Study"). (Ex. 12)

110.    Class Counsel acted reasonably and in the best interest of the class when they elected to settle the case rather than try to collect a potentially unenforceable judgment. This is particularly so considering that the settlement constitutes full value of the potential class recovery and is roughly equivalent to the Toshiba assets that would have been available for attachment in the United States. In keeping with the procedure recommended in the MANUAL FOR COMPLEX LITIGATION, attorneys' fees were negotiated apart from the package of relief for the class and after negotiations over the merits concluded. (Ex.10, 11, 12 & 13)

111.    Class litigation attacking defective computer design is a relatively new field compared to established areas of class action practice, such as securities or antitrust litigation. The Plaintiffs' attorneys in this case had no pre-existing legal precedent to use as a guideline for determining their chances of success in this matter. The Plaintiffs' attorneys were also moving into uncharted waters with respect to their cause of action based upon Title 18 U.S.C. § 1030 due to the lack of case law construing this statute in circumstances such as those at issue in this action. (Ex.10, 11, 12 & 13)

112.    A principal benefit of the percentage recovery method is that it aligns the interest of client and lawyer, giving the lawyer an incentive to press for the best possible recovery for the class. (Ex.10, 11, 12 & 13)

113.    The percentage recovery approach advances the important judicial policy of favoring

early settlements. (Ex.10, 11, 12 & 13)

114.    Toshiba supports the award of attorneys' fees, costs, expenses, and representative fees
        that are provided for in the proposed Settlement Agreement. (Ex. 6)

115.    Toshiba is generally aware of the time and effort expended by Class Counsel, their skill,
        and the results obtained, and agrees that the attorneys' fees, costs, expenses, and
        representative fees that are provided for in the proposed Settlement Agreement are fair
        and reasonable. (Ex. 6)

116.    In mega-fund cases where recoveries are very large, fees in the neighborhood of fifteen
        percent (15%) are common. For example, in the recent $1 billion ($1,000,000,000.00)
        settlement of the NASDAQ antitrust case, Senior District Judge Sweet awarded a fee of
        fourteen percent (14%). In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465
        (S.D.N.Y. 1998). The New York Times reported that a fee of fifteen percent (15%) was
        authorized by an unusual auction arrangement in the massive Cendant securities case.
        Joseph B. Treaster, *Investors Settle For $2.8 Billion In a Fraud Suit*, N.Y. TIMES,
        December 8, 1999, at A1.

117.    Several mega-fund settlements in the Fifth Circuit and Texas included attorneys' fees of
        fifteen percent (15%) or more. See In re Shell Oil Refinery, 155 F.R.D. 522 (E.D. La.
        1993) (18 percent of $170 million); In re Combustion, 968 F.Supp. 1116 (W.D. La.
        199X) (36 percent of $127 million); In re Lease Oil Antitrust Litig., (No. II), 186 F.R.D.
        403 (S.D. Tex.1999) (25 percent of more than $190 million); Weatherford Roofing Co. v.
        Employers National Insurance Co., No. 91-05637-F, 116th Judicial District (Dallas) (30
        percent of $140 million).

118.    Johnson Factors (2), (3), (9), and (10) inquire into the novelty and difficulty of the issues;
        the skill required to perform the legal services properly; the experience, reputation, and
        ability of the attorneys; and the undesirability of the case. Professor Coffee succinctly
        explained how novel and difficult this lawsuit was, why unusual skill and ability were
        needed to bring it to a successful conclusion, and why ordinary lawyers would have found
        it highly undesirable:

        For several reasons, the instant case faced serious risk from the outset. First, this
        appears to have been the first lawsuit to challenge Toshiba's [allegedly] defective
        Floppy Disk Controller. Thus, plaintiffs had no prior precedents or suits to guide
        them and had to develop the underlying facts and face unanticipated defenses
        (both legal and factual) entirely on their own. Earlier litigation involving
        defective computer products or codes had generally not fared well for plaintiffs.
        For example, Intel has been repeatedly sued in class actions alleging defective
        computer designs, including its famous 1994 debacle with its Pentium computer
        chip, which had a flaw affecting certain mathematical calculations. Yet, Intel

appears not to have made any economically significant settlements, but rather has escaped with non-pecuniary coupon or rebate settlements (said coupons not having the favorable attributes of those in the instant case).   In general, class litigation attacking defective computer design is a relatively new field compared to established areas of class action practice, such as securities or antitrust litigation, where favorable statutes and precedents tilt the playing field more to the plaintiffs' advantage.  Second, the Toshiba class action involved an inherently novel cause of action based on 18 U.S.C. § 1030.  Few cases have construed this statute, and defendants contended that it did not apply to a case in which plaintiffs could not prove that class members had suffered any actual data loss or corruption.  Third, because Toshiba is a foreign corporation (most of whose internal records are in Japanese), significant barriers existed to meaningful discovery or access to relevant corporate personnel.  Finally, as already noted, the ability of plaintiffs to enforce a U.S. judgment against Toshiba's non-U.S. assets was also highly problematic.

Declaration of Professor John C. Coffee, Jr., pp. 21-22 (footnote omitted). (Ex. 12)

119.   Professors Arthur Miller, Geoffrey Miller, and Samuel Issachroff all agreed with Professor Coffee's assessment. This conclusion-in the unanimous opinion of four of the country's most knowledgeable class action scholars–speaks volumes about the difficulty of the case.  This was a novel lawsuit and the first significant class-action victory against a high-tech company.  It required the services of exceptionally able lawyers who were willing to take significant risks that other lawyers would have rejected.  Any sensible application of Johnson factors would entitle these lawyers to a fee greatly in excess of the average.  Yet, the fee they agreed to accept when bargaining at arm's length with Toshiba is significantly below the percentages that judges usually award in common-fund cases.

120.   Johnson factors (6) and (8) inquire into whether the fee is fixed or contingent, and the amount involved and the results obtained.  Class action litigation is contingent fee litigation.  Lawyers get paid when they win, not when they lose.  However, class actions are unlike other contingent-fee lawsuits in terms of the magnitude of the risks lawyers must incur.  Ordinarily, the size of the nonpayment risk reflects the amount at stake in a case.  The larger the stakes, the more a defendant is willing to spend to avoid liability.  In class actions, the stakes are unusually large.  Consequently, class actions are inherently riskier than other contingent-fee representations.

121.   In this case, the risk of nonpayment was exceptionally great.  This is true, in part, because of the novelty of the claims and the history of failed class litigation against high-tech companies.  It also true since this is a multi-billion dollar case against solvent defendants who could reasonably be expected to spend tens of millions of dollars or more to avoid a loss at trial.  The risk of non-payment was palpable when the case was filed.  Class Counsel had every reason to fear that they would litigate the case for years and ultimately

79

lose. (Ex. 10, 11, 12 & 13)

122. Despite the enormous risks incurred, the results obtained for the class are spectacular. This appears to be the largest recovery ever in a consumer protection case brought only to remedy an economic loss. It is "off the charts" by comparison to other class-action settlements, as the expert reports by Professors Coffee, Issacharoff, Arthur Miller, and Geoffrey Miller explain. A reasonable application of Johnson factors (6) and (8) would again justify an above average fees, yet again the negotiated fee is well below average. (Ex. 10, 11, 12 & 13)

123. Johnson Factors (1), (4) and (7) inquire into the time and labor required, the preclusion of other employment; and time limitations imposed by the client or the circumstances. Because class members were at risk of harm every time they used floppy disks with their laptop computers, Class Counsel urged this Court to place this lawsuit on an expedited docket and to hold a hearing on a motion for injunctive relief at the earliest possible date. When this Court agreed, Class Counsel had to make good on their promise to get the case ready in an unbelievably short space of time. Class actions commonly last about two years before settling. T. Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts* 16 (1996) (reporting that "the median time period from filing the complaint to closing ranged from twenty-four to twenty-eight months for settled securities class actions"). By contrast, this Court placed this case on a schedule requiring it to be ready for a trial on the merits in less than thirteen months. That schedule was being met even though it involved reviewing millions of pages of documents and other records, many of which were in a foreign tongue and had to be translated; even though it involved dozens of depositions and required an unusual amount of input from experts on technical issues relating to computer operations; even though the claims were path-breaking and, thus, subject to more than the usual variety of attacks; even though the Defendants had extremely competent lawyers; and even though liability and damages were strongly disputed.

124. The lawsuit could only be prepared in the time allowed because Class Counsel gave it top priority and incessantly worked on it. Their commitment of resources–human and financial–was total. Settlement negotiations and trial preparations were separately tracked so that participation in court-ordered mediation would not entail a delay. (Ex. 7)

125. This Court–together with United States Magistrate Judge Wendell C. Radford–observed the day-to-day conduct of this litigation and decided the many discovery objections, pretrial motions, and other disagreements and issues that arose. Consequently, this Court is thoroughly familiar with the time limitations the trial schedule imposed, with the extraordinary commitment of time and labor the case required, and with the inability of Class Counsel to attend to other matters or to take on new business while this case was in active litigation.

126.   This Court adopts by reference in this listing of Findings of Fact all other findings expressed in its opinion or associated orders as if those findings were included in this listing.

It is SO ORDERED.

Signed this 28th day of January, 2000.

Thad Heartfield
United States District Judge